Jonathan D. **CHRISTENBURY, M.D.**
**and Christenbury Eye Center,**
**P.A., Plaintiffs,**

v.

**LOCKE LORD BISSELL & LIDDELL, LLP formerly known as Lord Bissell & Brook, LLP, and Brian T. Casey, Defendants.**

Civil Action No. 1:11–CV–3459–JEC–JSA.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 18, 2012.

David J. Hungeling, Adam Scott Rubenfield, Law Office of David J. Hungeling, P.C., George A. Koenig, Koenig Law Group, P.C., Atlanta, GA, for Plaintiffs.

Brent E. Basden, Paul Koning, Koning Rubarts, LLP, Dallas, TX, Elizabeth J.

Campbell, Locke Lord Bissell & Liddell, LLP, Atlanta, GA, for Defendants.

## ORDER

JUSTIN S. ANAND, United States Magistrate Judge.

The two sides in this professional negligence case present dueling motions to compel, each seeking privileged communications held by the other. The parties generally agree that all or most of the documents they seek were once privileged, but argue that any privileges have been waived for various reasons. The matter is now before the undersigned to resolve this clash.[1] For the reasons set forth below, Defendants' Motion to Compel Production [22] is **GRANTED IN PART,** and **DENIED IN PART** and Plaintiffs' Motion to Compel Production [27] is **DENIED.**

## I. BACKGROUND

### A. *The Allegations In The Complaint And The Defenses*

This is a diversity action for breach of contract, professional negligence, breach of fiduciary duty, and negligent misrepresentation. Plaintiffs allege that in October 2002, Plaintiff Christenbury spoke with a Texas attorney, Terry Lustig, about obtaining a tax-favorable insurance and financial product with $2.5 million in proceeds from the recent sale of a business asset. Complaint [1] ("Compl.") ¶¶ 7–8. Lustig advised Christenbury of the "Nevis Asset Protection Trust," an insurance-related product offered through Fidelity Insurance Company Ltd. ("Fidelity") and Offshore Trust Services, Inc. ("OTS"). On Christenbury's behalf, Lustig obtained a tax opinion letter from Defendants that the proposed transaction would qualify for a federal income tax deduction and not constitute a tax shelter. Compl. ¶¶ 9–13. The Defendants issued their opinion letter on December 18, 2002, based on "the representations and advice, including financial information, from various parties to the Transaction." Compl. ¶¶ 14–26; Exhibit A to Complaint [1]. Defendants specifically listed 37 factual representations upon which they stated they relied, most of which came from Fidelity. Compl. ¶¶ 17–18.

Defendants also represented Fidelity and OTS. Contemporaneously with issuing the tax opinion, Defendant Casey sent a conflict waiver to Christenbury stating that "[t]his firm, primarily through me, represents Fidelity and Offshore Trust Services on various insurance matters. The purpose of this letter is to confirm with you this firm's representation of Fidelity and OTS on unrelated matters concurrently with the firm's representation of Christenbury Eye Center in this matter...." Compl. ¶ 29. Christenbury signed the conflict waiver the next day. Compl. ¶ 30. Christenbury claims that the assertion that Defendants represented Fidelity and OTS on "unrelated" matters was false. Compl. ¶ 31.

Some time thereafter, Christenbury purchased the financial instrument from Fidelity, allegedly in reliance on Defendants' tax opinion. Compl. ¶ 28. Subsequently, in September 2003, Christenbury received a letter from Casey stating that "we have learned that some of the material facts regarding the Policy and the related reinsurance and guarantee structure do not appear as they were represented to us as stated in the Opinion.... Consequently, if these and other representations made to us were not true, we may be required to withdraw the Opinion, effective as of December 18, 2002 (its issue date) and, in such case, the Opinion should not be relied on in any respect." Compl. ¶ 32.

Upon receiving the withdrawal letter, Christenbury tried to terminate the Nevis Trust and recover the $2.5 million. Compl. ¶ 34. He consulted Lustig and retained the Nevis law firm Crozier & Associates during this time. *See* Defendants' Brief [22] ("Def. Br.") at 3, 6. Fidelity offered to refund Christenbury's investment, less contractually-established "redemption and/or termination fees" of approximately $370,000, in exchange for the execution of an indemnity agreement releasing Fidelity from liability. Compl.

---

1. The District Court referred these disputes to U.S. Magistrate Judge C. Christopher Hagy in March 2012 [28]. The matter was reassigned to the undersigned on June 4, 2012.

¶ 35. Christenbury rejected this offer and instead sued Fidelity in the Nevis courts. Compl. ¶ 36. That suit, in which Christenbury is represented by Crozier, remains pending.

Christenbury later sued Lustig in Texas. Compl. ¶ 37. Christenbury accused Lustig of negligence, breach of fiduciary duty, negligent misrepresentation, and breach of contract, alleging that Lustig advised him to participate in this transaction in which he lost his investment and incurred IRS penalties. *See* Exhibit 5 to Defendants' Motion to Compel [22] ("Lustig Petition"). The case has since been resolved pursuant to a confidential agreement. Compl. ¶ 37.

Plaintiffs brought the instant suit on October 11, 2011. They bring four causes of action against Defendants: (1) breach of contract, alleging that Defendants materially breached the contract to perform legal services for Plaintiffs; (2) professional negligence, alleging that Defendants failed to exercise their duty of care in performing legal work for Plaintiffs; (3) breach of fiduciary duty, alleging that Defendants breached their duties to Plaintiffs by placing their own interests ahead of Plaintiffs' by receiving fees from both Fidelity and Plaintiffs and by failing to cooperate with Plaintiffs in their attempts to sue for the return of their investment; and (4) negligent misrepresentation, alleging that Defendants negligently supplied false information to Plaintiffs in the tax opinion and conflict waiver letters, on which Plaintiffs relied in entering into an investment relationship with Fidelity. Plaintiffs allege direct, foreseeable, and proximate losses of $2.5 million.

Among other defenses, Defendants assert lack of causation, proportionate responsibility, and comparative or contributory negligence. Defendants argue that Plaintiffs decide to participate in the Nevis Trust transaction based not just (or not even at all) on Defendants' advice, but instead in whole or in part on advice by Lustig. Defendants also assert a defense of failure to mitigate damages, premised among other things on Plaintiffs' rejection of Fidelity's redemption offer.

### B. *The Motions To Compel*

Plaintiffs and Defendants now seek numerous documents from each other as to which each side has asserted a privilege.

#### 1. *Defendants' Motion to Compel*

Defendants seek documents regarding the legal services provided to Plaintiffs by Lustig and Crozier. Further, Defendants seek documents relating to the services of accountant Glenn Henderson, who Plaintiffs engaged after the transaction to prepare relevant tax filings, and who Plaintiffs have also sued for malpractice. Defendants essentially seek two categories of documents:

- Communications with Lustig relating to the decision to participate in the Nevis Trust transaction; and

- Post-transaction communications with Lustig, Henderson, and Crozier, relating to tax filings Henderson prepared, Plaintiffs' decision to reject Fidelity's offer to return the investment, and other efforts to "unwind" the deal.

Defendants argue that any advice Plaintiff received and relied on from others as to whether to invest with Fidelity would show that Defendants' advice did not cause or was not solely responsible for the transaction. Defendants argue that any advice that Plaintiffs received relating to Fidelity's settlement offer is relevant to Defendants' failure-to-mitigate-damages defense.

Defendants argue that no privilege protects communications between Plaintiff and his accountant, Henderson. Otherwise, Defendants do not deny that they are seeking attorney-client communications vis-à-vis Plaintiffs' interactions with Lustig and Crozier. Defendants instead argue that Plaintiff waived any privilege associated with those communications pursuant to the "offensive use doctrine." In other words, Defendants argue that by accusing them of malpractice relating to this transaction, Plaintiffs have waived any privileges regarding other advice they received from other lawyers relating to (a) Plaintiffs' decision to transact with Fidelity, and (b) Plaintiffs' failure to mitigate their damages.

### 2. *Plaintiffs' Motion to Compel*

Plaintiffs oppose Defendants' motion, and counter with their own. They ask the Court to compel Defendants to produce documents relating to Defendants' representation of Fidelity, OTS, and any of their principals and affiliates, including Defendants' entire client files for those entities. Plaintiffs' Brief [27] ("Pl. Br.") at 11–12. As with Defendants, Plaintiffs do not contest that they are seeking otherwise privileged attorney-client communications. Plaintiffs instead argue that the Court should pierce any privilege under the crime-fraud exception, alleging that Fidelity's communications with Defendants furthered a fraud.

## II. DISCUSSION

### A. *Defendants' Motion to Compel*

In sum, as explained below, the Court finds that (1) Georgia's accountant-client privilege applies; (2) Plaintiffs have impliedly waived any privileges that would otherwise apply to communications with Lustig or other professionals as to whether Plaintiffs should participate in the Nevis Trust transactions; but (3) Plaintiffs have not waived any privileges as to post-transaction communications, including advice from accountants and lawyers as to whether to accept Fidelity's settlement offer.

### 1. *The Accountant–Client Privilege Applies In This Case*

■ The parties agree that Georgia's law of privilege applies in this case to all issues except the work product doctrine. *See, e.g.,* *McDonald v. H & S Homes, LLC,* No. 5:08–cv–298(CAR), 2009 WL 4251174, at *3 (M.D.Ga. Nov. 23, 2009) ("Georgia's law of privilege controls in this case because the case is before the Court under diversity of citizenship jurisdiction and Georgia law governs the resolution of the dispute.").[2] This

follows from Federal Rule of Evidence 501, which provides that "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law." [3]

The Georgia code specifically provides for an accountant-client privilege, *see* O.C.G.A. § 43–3–32, and Georgia courts interpret its scope as analogous to that of the attorney-client privilege. *See Crews v. Wahl,* 238 Ga.App. 892, 520 S.E.2d 727, 732 (1999) (citing *Gearhart v. Etheridge,* 232 Ga. 638, 208 S.E.2d 460 (1974)).

However, Defendants dispute whether a Georgia court would apply the accountant-client privilege to Plaintiffs' communications with Henderson, which occurred entirely outside Georgia. Neither Texas (where Henderson is located) nor North Carolina (where Plaintiffs are located) recognize such a privilege. *See Canyon Ptrs. v. Developers Diversified Realty Corp.,* No. 3–04–CV–1335–L, 2005 WL 5653121, at *1 (N.D.Tex. Nov. 4, 2005); *State v. Agnew,* 294 N.C. 382, 241 S.E.2d 684, 692 (1978). And neither does federal common law, *see, e.g., United States v. Bisanti,* 414 F.3d 168, 170 (1st Cir.2005) ("There is no common law accountant-client privilege. . . ."). According to Defendants, whether a Georgia court would apply the privilege to communications that occurred in jurisdictions that do not recognize the privilege is a question of first impression, and the Defendants urge the Court to answer that question in the negative.

■ The Court believes that a Georgia court applying Georgia's law of privilege would likely apply the accountant-client privilege in this case. Defendants ask the Court to read into this statute a geographic limitation that is not apparent from the text and

---

**2.** Plaintiffs have invoked work product as a secondary ground upon which they object to production of post-transaction communications. "Unlike the attorney-client privilege, federal law governs the work product doctrine, even in a diversity case." *In re ConAgra Peanut Butter Prods. Liability Litigation,* No. 1:09–MD–1845–TWT, 2009 WL 799422, at *2 (N.D.Ga. Mar. 24,

2009) (citing *United Coal Companies v. Powell Constr. Co.,* 839 F.2d 958, 966 (3d Cir.1988)).

**3.** "Privilege" under the discovery rules in the Federal Rules of Civil Procedure corresponds to privilege protections afforded by the law of evidence. *See United States v. Reynolds,* 345 U.S. 1, 6–7, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

finds no support in any case law Defendants cite. Indeed, the statute broadly covers "all communications between a certified public accountant" and his client, and provides that such communications are privileged "in all courts or any other proceedings whatsoever." O.C.G.A. § 43–3–32. The legislature was capable of expressing a geographic limitation if that is what it intended, but rather chose this exceedingly broad language.

Moreover, a Georgia court would likely consider the policy behind the accountant-client privilege, which was enacted to further the State's public policy of encouraging a client to "transmit all relevant information to his accountant without fear of any future disclosure in subsequent litigation." *Gearhart*, 208 S.E.2d at 461. Texas's and North Carolina's failure to recognize the privilege conflicts with this public policy. *See Karimi v. Crowley*, 172 Ga.App. 761, 324 S.E.2d 583, 584 (1984) ("[t]he laws of other states have no force in Georgia except on principles of comity and so long as their enforcement is not contrary to the policy of this State.").

Although it did not involve Georgia law, at least one federal court has applied the forum state's accountant-client privilege to out-of-state communications, citing public policy. *See Hare v. Family Publications Service, Inc.*, 334 F.Supp. 953, 961 (D.Md.1971) (in a diversity case brought in the District of Maryland, finding communications by a New York accountant made in New York to be privileged, despite that New York, unlike Maryland, did not provide for a statutory accountant-client privilege, since "[c]omity between the states does not require the Maryland courts to enforce a law or policy of a sister state when such action would violate the public policy of Maryland.").[4] A Georgia court would likely find this decision persuasive, as, on matters of privilege and waiver, Georgia courts consider "decisions of federal courts interpreting federal rules [to be] per-

suasive authority," *McKesson HBOC, Inc. v. Adler*, 254 Ga.App. 500, 562 S.E.2d 809, 813 n. 4 (2002) (citing *Ambler v. Archer*, 230 Ga. 281, 196 S.E.2d 858 (1973)).

Thus, the Court finds that Plaintiffs' communications with his accountant, Henderson, are protected by the Georgia accountant-client privilege to the same extent as his communications with his attorneys.[5]

2. *Plaintiffs Have Waived The Attorney–Client Privilege As To Advice About The Fidelity Transaction*

Under Federal Rule of Civil Procedure 26(b), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense...." Pursuant to O.C.G.A. §§ 24–9–21, 24–9–24, 24–9–25, and 24–9–27(c), confidential legal advice from an attorney to a client is privileged and therefore not subject to discovery. Georgia courts have held that, to invoke the privilege, a party must show that an attorney-client relationship existed and the communication in question constituted confidential legal advice or a request for such. *Southern Guar. Ins. Co. of Ga. v. Ash*, 192 Ga.App. 24, 383 S.E.2d 579, 583–84 (1989).

Here, Plaintiffs assert, and Defendants do not contest, that Defendants seek confidential attorney-client advice in the form of Plaintiffs' communications with Lustig about the Fidelity transaction. Rather, the issue is whether Plaintiffs have waived that privilege pursuant to the "offensive use" doctrine.

▮ The offensive use doctrine, sometimes known as "at issue" or "implied" waiver, provides that a litigant waives the privilege when he "place[s] information protected by [the privilege] in issue through some affirmative act for his own benefit," since "to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party." *Cox v. Administra-*

---

4. *Cf. Matter of International Horizons, Inc.*, 689 F.2d 996, 1003 (11th Cir.1982) (refusing to apply Georgia's accountant-client privilege in bankruptcy action involving no claims governed by state law, noting that "because the bankruptcy proceeding did not yet involve state claims, the Bankruptcy Court was not required to apply Georgia's accountant-client privilege.").

5. Defendants do not in this motion allege that Plaintiffs have improperly asserted this privilege as to particular communications. Indeed, neither party has challenged the assertion of privilege as to any particular document or requested that the Court review the content of any withheld documents or privilege logs describing such.

tor *U.S. Steel & Carnegie,* 17 F.3d 1386, 1418–20 (11th Cir.1994) (citations and quotations omitted).[6] In *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash.1975), the district court for the Eastern District of Washington set out a three-part test for determining when implied waiver has occurred: (1) the party asserting the privilege affirmatively acted in a manner which resulted in the assertion of the privilege; (2) through the affirmative act, that party placed the protected information at issue by making it relevant to the case; and (3) application of the privilege would deny the opposing party access to information vital to its defense. The *Hearn* standard, widely seen as the majority view, is followed by the Eleventh and other Circuit Courts of Appeal.

■ Professional malpractice suits often involve questions of implied waiver. For example, a client impliedly waives when he accuses his attorney of breach of contract or malpractice, affirmatively placing the subject matter of the lawyer's representation at issue. *See Daughtry v. Cobb,* 189 Ga. 113, 5 S.E.2d 352, 353 (1939). In *Daughtry,* an attorney sued a client for breach of contract. The client, in turn, claimed that the execution of the contract was induced by fraudulent representations by the attorney and was thus void. *Id.* The trial court permitted the attorney to testify as to otherwise privileged communications in this engagement, and the Georgia Supreme Court affirmed, since:

> the rule as to privilege has no application where the client, in an action against he attorney, charges negligence or malpractice, or fraud, or other professional misconduct. In such cases it would be a manifest injustice to allow the client to take advantage of the rule of privilege to the prejudice of his attorney.... This applies with equal force to the testimony of the other witnesses in behalf of the [attorney].

*Id.* at 355. (citations and quotation marks omitted). Since *Daughtry,* Georgia courts have consistently affirmed that the attorney-client privilege may be impliedly waived

"when a client charges negligence, malpractice or other professional misconduct in an action against the attorney." *Waldrip v. Head,* 272 Ga. 572, 532 S.E.2d 380, 386 (2000).

Defendants ask the Court to apply the offensive use doctrine in a different way. Defendants do not seek a finding that Plaintiffs waived the attorney-client privilege between Plaintiffs and Defendants. Rather, Defendants assert that by suing them for malpractice, and by thereby triggering Defendants' causation and comparative negligence defenses, Plaintiffs have waived any privilege vis-à-vis Plaintiffs' communications with *other* lawyers about the same subject matter. Defendants argue that Plaintiffs' lawsuit necessarily puts at issue whether Plaintiffs were receiving and relying on independent advice from other professionals about whether to participate in the Nevis Trust transaction. Whether the offensive use doctrine extends to communications with third-party attorneys appears to be a question of first impression under Georgia law.

But although novel in Georgia, the question has been addressed elsewhere. The Supreme Court of Washington expanded the scope of implied waiver in malpractice suits to communications with third-party attorneys in *Pappas v. Holloway,* 114 Wash.2d 198, 787 P.2d 30 (1990). The plaintiff-attorney in that case, Pappas, brought an action to recover fees against a client, the Holloways, who then brought malpractice counterclaims alleging that Pappas negligently prepared their case. In response, Pappas brought third-party complaints against all of the other attorneys who had represented the Holloways in the same underlying case, alleging that they also breached duties of care to the Holloways. The court found that the Holloways impliedly waived any privilege covering their communications with those other attorneys because the Holloways' counterclaim put causation and damages at issue, and Pappas required access to communications relating to the un-

---

6. As noted above, in light of the "scarc[ity] [of Georgia case law] on the waiver issue," *In re Haile,* Nos. 88–40864 and 90–4118, 1992 WL 12004362, at *2 (Bkrtcy.S.D.Ga. Mar. 10, 1992), and since "Georgia's Civil Practice Act is mod-

eled on the Federal Rules of Civil Procedure," on matters of privilege and waiver Georgia courts consider "decisions of federal courts interpreting federal rules [to be] persuasive authority," *McKesson HBOC, Inc.,* 562 S.E.2d at 813 n. 4.

derlying litigation to prepare an adequate defense. *Id.* at 36. The court concluded that the malpractice claim analysis "will involve examining decision made at various stages of the underlying litigation. This will necessarily involve information communicated between these attorneys and the Holloways. This is particularly true given that Pappas was not the attorney who actually tried the case." *Id.* at 37.

At least two federal courts have followed *Pappas.* In *Rutgard v. Haynes,* a client also sued his lawyer for malpractice, and the lawyer also alleged that another counsel's negligence could have caused or contributed to the plaintiff-client's damages. 185 F.R.D. 596, 598–600 (S.D.Cal.1999). The court, relying on *Pappas,* held that by accusing the defendant-attorney of negligently causing damages, the plaintiff-client necessarily waived the attorney-client privilege with respect to communications with the third-party attorney on the same subject matter. *Id.* at 599–600. The court found that the plaintiff's suit put damages and causation at issue, which opened the door to discovery as to other advice plaintiff had received. *Id.*

*Simmons Foods v. Willis,* 191 F.R.D. 625, 635–37 (D.Kan.2000) found the same. In that legal malpractice case, the defendants alleged that it was not them, but rather other retained counsel, who breached a duty owed to the plaintiff and proximately caused the plaintiff's alleged injuries. Following *Pappas,* the court found implied waiver vis-à-vis the communications between the plaintiff and non-party counsel, since the defendant-attorneys had reasonably raised the affirmative defense of that counsel's comparative negligence. *Id.*

Not all jurisdictions extend the offensive use doctrine to a non-party's advice. Plaintiffs point to *Coates v. Akerman, Senterfitt & Eidson, P.A.,* 940 So.2d 504 (Fla.Dist.Ct.App. 2006). In *Coates,* former clients sued the attorneys that advised them concerning a failed joint venture. The trial court granted the attorneys' motion to compel and held that certain privileged communications with other lawyers were discoverable under the "at issue" doctrine. The appeals court reversed. The court held that a plaintiff impliedly waives a privilege *only* when he brings a claim that will necessarily require proof by way of privileged communications, but *not* when the defendant raises a defense based upon the plaintiff's privileged communications with others. According to *Coates,* "waiver of the attorney-client and work-product privileges is not favored in Florida." *Id.* at 508–09.

The Court, however, finds *Coates* inapposite to the Georgia state law claims presented in this case. For one thing, Georgia case law makes clear that, rather than broadly disfavoring waiver of attorney-client privilege, the courts confine the attorney-client privilege "to its narrowest permissible limits."[7] Further, Georgia courts borrow from federal law to fill gaps in Georgia's privilege and waiver jurisprudence. Neither party has cited any Georgia case bearing on the issue at hand: Whether a defendant-attorney can discover otherwise privileged communications between a client and other retained counsel as a result of asserting comparative or contributory negligence and failure to mitigate damages defenses. But federal law has largely found implied waiver in such situations. The Court will therefore follow *Pappas, Rutgard* and *Simmons Foods* here, and not *Coates.*

Applying *Pappas, Rutgard* and *Simmons Foods,* the Court agrees that Plaintiffs placed their communications with Lustig at issue and waived privilege to at least a limited extent. Plaintiffs claim that Defendants' negligence proximately caused Plaintiffs' injury, which is a necessary element of malpractice. *See, e.g., Blackwell v. Potts,* 266 Ga.App. 702, 598 S.E.2d 1, 3–4 (2004). But Plaintiffs have separately sued Lustig, and

---

7. *See Tenet Healthcare Corporation v. Louisiana Forum Corporation,* 273 Ga. 206, 538 S.E.2d 441, 444 (2000) ("In *Atlantic Coast Line R. Co. v. Daugherty,* 111 Ga.App. 144 (1), 141 S.E.2d 112 (1965), the Court of Appeals confined the attorney-client privilege ... to its narrowest permissible limits under the statute of its creation.... Inasmuch as the exercise of the privilege results in the exclusion of evidence, a narrow construction of the privilege comports with the view that the ascertainment of as many facts as possible leads to the truth, the discovery of which is the object of all legal investigation.") (internal quotation marks omitted).

in that suit, Plaintiffs also alleged professional malpractice and causation vis-à-vis the Nevis Transaction, and appear to seek damages overlapping those sought in this case. [22–8]. To the extent Plaintiffs were receiving and relying on advice from Lustig or others on this same subject, that potentially undermines causation here. It also gives Defendants a reasonable basis to pursue a comparative negligence defense. Plaintiffs can accuse more than one attorney of malpractice. But in doing so here they put at issue whether and to what extent each attorney's advice actually caused their loss and/or are responsible for a share of damages.

Plaintiffs' affirmative act placing the information at issue satisfies the first and second prongs of *Hearn*. As for the third prong, the Court also finds that applying the privilege would deny the Defendants vital discovery. Defendants' entire theory of causation and comparative negligence turns on Plaintiffs' communications with the other professionals Plaintiffs were consulting. By definition, Defendants were not a part of these communications. That Plaintiffs have in fact sued other professionals give Defendants more than a reasonable basis to believe helpful documents might be obtained.[8] The equities weigh in favor of permitting discovery.

The Court believes that a Georgia court would likely follow the federal precedents of *Rutgard* and *Simmons Foods*, and not the Florida case *Coates*. But this is also the correct result here. *Coates* rests on the notion that a defendant cannot waive a plaintiff's privileges by inserting defenses into the case. 940 So.2d at 509. This Court does not

see the issue that way, at least on these facts. It was Plaintiffs who accused Defendants of proximately causing $2.5 million in losses, by providing bad advice as to the Nevis Trust transaction. Defendants' defenses of causation and comparative negligence are a reasonable response to this affirmative act by Plaintiffs.

Accordingly, the Court finds implied waiver as to any privileged communications between Plaintiffs and Lustig or other professionals bearing on whether to participate in the Nevis Trust transaction.[9]

### 3. Plaintiffs Have Not Waived Any Privileges Relating To Post–Transaction Advice

■ Defendants do not stop at requesting communications with Lustig regarding the transaction. They also seek Plaintiffs' post-transaction communications with Lustig and/or Crozier about how to "unwind" the deal, and specifically whether to accept Fidelity's settlement offer. They also seek communications with Henderson, who according to Plaintiffs only prepared post-transaction tax returns. The Court declines to find implied waiver as to these post-transaction communications.

The Court again draws on *Pappas*. *Pappas* limits its finding of waiver to the legal advice plaintiff received from other lawyers on the same subject matter and during the same time period as the malpractice alleged against the defendant. *Pappas* expressly distinguished "communications which took place after any alleged malpractice would have been committed." 114 Wash.2d at 205,

---

8. Plaintiffs suggest that Defendants have the option of deposing Christenbury about the transaction. Plaintiffs' Response in Opposition [30] at 21. But if Plaintiffs are refusing to produce documents relating to communications with Lustig and others, the Court is unclear what purpose there would be in Defendants asking Christenbury about these same topics. Presumably, if Plaintiffs object to the production of documents, they would also object to questions about Plaintiffs' discussions with Lustig. After all, whether communications are privileged does not turn on whether they are written or oral. If what Plaintiffs are suggesting is that Christenbury would freely discuss communications with Lustig in a deposition, but selectively assert privilege as to documents, that would seem to undermine the assertion of a privilege. In any event, Defen-

dants are entitled to documentary discovery, which often is critical to effective testimonial discovery especially from an adversary.

9. The Court finds implied waiver regardless, but finds it notable that Plaintiffs *also sued Lustig*. In other words, Plaintiffs did not just impliedly waive their privilege vis-à-vis communications with Lustig by suing Defendants. Plaintiffs also affirmatively and deliberately sued Lustig for what appears to be overlapping damages based on the same transaction. The Court does not rest on this fact alone as establishing waiver in this subsequent lawsuit against Defendants; but Plaintiffs' affirmative suit against Lustig further distinguishes *Coates*.

787 P.2d 30. *Pappas* noted that several cases have denied waiver as to post-malpractice communications, because those communications "would have no effect on the malpractice issue raised in plaintiff's complaint [and defendant's causation and comparative negligence defenses]." *Pappas* made a point of distinguishing those cases.

*Pappas's* distinction of post-malpractice advice makes sense here. In this case, neither Plaintiffs' accusation against Defendants, nor Defendants' affirmative defenses, puts Plaintiffs' post-transaction legal or accounting advice at issue. For example, Henderson's subsequent preparation or lack of preparation of tax filings after the transaction closed has little bearing on whether Defendant's pre-transaction advice was sound, whether Plaintiffs relied on that pre-transaction advice, and whether Plaintiffs acted partially on other bad advice from other lawyers.[10]

What Defendants mainly seek are any communications regarding Plaintiffs' decision to reject Fidelity's settlement offer. Defendants assert that Plaintiffs' decision to "spurn" Fidelity's offer to repay 85% of the investment—in exchange for a release of liability—was "extremely imprudent." Def. Reply Br. [33] at 5. Defendants argue that, if this decision was made on the basis of attorney or accountant advice, "that advice was negligent and was an independent proximate cause of Christenbury's alleged damages." *Id.* If the decision was not based on professional advice, Defendants characterize that as a "failure to mitigate." *Id.*

This pushes the offensive use doctrine too far. Plaintiffs do not accuse Defendants of giving bad advice on this settlement offer. The settlement offer was made by another party—essentially an alleged joint tortfeasor—after Defendants' alleged malpractice. That Plaintiffs could have but declined to cut their losses by compromising with a non-party—subsequent to Defendants' alleged torts—does not waive any privilege. It may be that Plaintiffs' decision will be relevant at trial, on a failure-to-mitigate theory or otherwise. But the Court fails to see how Plaintiffs' decision not to settle allows Defendants to discover Plaintiffs' lawyers' advice.

What Defendants request would be a dangerous intrusion into the privilege. By suing a tortfeasor for damages, must a plaintiff reveal privileged advice from his lawyers as to why he did not settle with others? Tortfeasor A might very well be entitled to discover plaintiff's settlements with Tortfeasors B, C & D, and might be able to use those settlements at trial or in limiting damages. But are all of these Tortfeasors entitled to ask the plaintiff's lawyers about whether and on what terms they advised plaintiff should settle with each of the others? Of course the answer is no, as litigants must be able to confidentially discuss with their lawyers topics such as litigation risk, settlement values, and case strategy. If litigants were instead required to explain themselves—and produce their lawyers for discovery—every time they reject a settlement offer in a case with multiple defendants, this would eviscerate the privilege. This result naturally extends from Defendants' position.[11]

To be sure, *Rutgard* extended the implied waiver doctrine to a plaintiff's discussions with a lawyer retained after the defendant's alleged malpractice. But the facts were different. The defendant-attorney allegedly prosecuted a meritless and malicious lawsuit on the plaintiff's behalf. When the plaintiff was sued for malicious prosecution, he hired separate counsel to defend himself, and ultimately settled. The plaintiff then sought to recover the settlement, among other costs, in a malpractice case against the defendant-attorney. In this context—where the subse-

---

10. Plaintiffs represent that they are not seeking in this lawsuit any of the penalties assessed by the IRS related to Henderson's alleged post-transaction negligent filing of forms.

11. Plaintiffs allege that the work product doctrine also protects post-transaction documents. In this case, Defendants have not disputed that the documents withheld as privileged would fall within the protections of the attorney-client privilege and/or work product doctrine. Rather, what Defendants assert is that Plaintiffs impliedly waived these privileges. Thus, it is not necessary for the Court to assess the threshold applicability of the attorney-client or work product doctrines, and in fact no party has even requested that the Court do so.

quent settlement formed the very damages plaintiff sought from defendant—the court found that plaintiff put the reasonableness of that settlement at issue. Thus, the court found waiver as to the second attorney's work on the settlement. This is inapposite. The damages Plaintiffs demand from Defendants here did not arise as a result of subsequent advice. At most, Plaintiffs' losses might have been partially offset had they subsequently settled against others. But that alone cannot put "at issue" Plaintiffs' privileged discussions.

Even if Plaintiffs' post-transaction communications were "at issue," the Court finds that Defendants fail the third prong of *Hearn*, i.e., they fail to show that these documents are vital to their defense. There is no privilege as to the core fact underlying Defendants' failure-to-mitigate defense, i.e., that Fidelity offered Plaintiffs a settlement of 85% of their losses and Plaintiffs said no. This basic fact is available to Defendants if admissible to support a liability and/or damages defense. Defendants have not sufficiently established that to fairly present this defense they also require Plaintiffs' confidential attorney-client discussions as to the merits of the settlement.

Thus, the Court finds implied waiver as to Plaintiffs' communications with counsel about the transaction decision. Accordingly, it is **ORDERED** that Defendants' Motion to Compel [22] be **GRANTED IN PART**, compelling discovery of otherwise privileged communications concerning Plaintiffs' decision to invest in the Nevis Trust. However, as explained above, it is **ORDERED** that Defendants' Motion to Compel [22] be **DENIED IN PART** as to privileged communications beyond that.

B. *Plaintiffs' Motion to Compel*

The Court next addresses Plaintiffs' Motion to Compel. Plaintiffs seek the produc-

tion of Defendants' entire client files regarding their representation of non-parties Fidelity and OTS as well as unredacted copies of all documents produced by Defendants to date. Plaintiffs contend that this information is relevant to Plaintiffs' claims that Defendants had or should have had knowledge of the Nevis Trust transaction "independent of any representations made to Defendants" and that Defendants knew or should have known that the transaction "was likely a fraud." Pl. Br. at 12. Plaintiffs argue that the crime-fraud exception bars Defendants' assertion of the attorney-client privilege with respect to the Fidelity and OTS client files. As explained below, the Court disagrees.[12]

■ The crime-fraud exception provides that the attorney-client and work product privileges do not protect communications which contemplate crimes, fraud, or perjury. Specifically, privilege:

> does not cover communications respecting proposed infractions of the law in the commission of a crime or the perpetration of a fraud. The privileged communications may be a shield of defense as to crimes already committed, but it cannot be used as a sword or weapon of offense to enable persons to carry out contemplated crimes against society, frauds, or perjuries.

*Atlanta Coca–Cola Bottling Co. v. Goss*, 50 Ga.App. 637, 179 S.E. 420 (1935) (citations and internal quotation marks omitted).

■ "To secure disclosure of privileged documents under this exception, the party seeking disclosure must make a *prima facie* showing that the communication was made in furtherance of illegal or fraudulent activity." *Lazar v. Mauney*, 192 F.R.D. 324, 328 (N.D.Ga.2000) (citing Georgia law in a diversity action) (citations omitted). This cannot be made "merely by making a charge of fraud." *Atlanta Coca–Cola Bottling Co.*, 179

---

12. In a footnote, Plaintiffs also "contend that much of the contents of Defendants' client files for Fidelity, OTS, their principals, and their affiliates is not subject to privilege, as the files would undoubtedly contain correspondence shared with third parties." Pl. Br. at 18 n. 17. Plaintiffs, however, fail to develop or explain this argument at all. For instance, Plaintiffs do not provide examples of documents Plaintiffs obtained from third parties, or a privilege log showing that documents were shared with third parties. For this reason, the Court rejects this claim of waiver as unsupported, and focuses on the only argument raised in the body of Plaintiffs' Motion to Compel, that the crime-fraud exception should apply in this case.

S.E. at 421. Rather, "[t]o drive the privilege away, there must be something to give colour to the charge; there must be *prima facie* evidence that has some foundation in fact." *Id.* (citations and quotation marks omitted).

    ■ Here, "Plaintiffs do not contend that Defendants knowingly and willfully committed fraud." Plaintiff's Reply Brief [35] at 3 n. 6. Rather, Plaintiffs allege that as a result of negligence, "Defendants included several blatantly false statements into the Tax Opinion, effectively assisting Fidelity in defrauding Plaintiffs." Plaintiff's Reply Brief [35] at 3. Plaintiffs rely on exhibits allegedly showing: (1) inaccuracies and contradictions on the face of the Tax Opinion Letter and its attached exhibits, and (2) admissions by a Locke Lorde attorney conceding that some of the representations in the Tax Opinion Letter may be contradictory and the result of poor reviewing by attorneys at the firm. Plaintiffs also allege that other courts have found fraud by Fidelity or Fidelity's parent company for "materially similar transactions."[13] Defendants deny that this constitutes *prima facie* evidence of fraud. But Defendants also state that, regardless, they have already produced all privileged documents regarding their work on the tax opinion letter for this transaction.[14]

Plaintiffs have failed to show *prima facie* evidence that Defendants engaged in privileged communications with Fidelity in furtherance of a crime or fraud. What Plaintiffs primarily cite are Defendants' internal notes, which appear to reflect a realization by one of Defendant's employees that facts as stated in Plaintiffs' opinion letter were wrong. Plaintiffs' Motion to Compel [27], Exs. G & H. But these notes do not themselves establish that the reason for the apparent inaccuracies was fraud, as opposed to mistake or oversight by Defendants and/or others. For example, while the meaning of the notes is not entirely clear without more context, at least a few of the entries can be read as suggesting that Defendants failed to review documents that had been provided to them by Fidelity. Indeed, Plaintiffs' theory of malpractice is that Defendants were provided the key documents that revealed the true nature of the Nevis Trust transaction, and that Defendants simply "did not read" them. Plaintiff's Response in Opposition [30] at 4. The undersigned cannot conclude based on this or other evidence presented that Plaintiffs have sufficiently established fraud.[15]

    ■ Further, Plaintiffs' motion is overbroad. The "crime-fraud exception has a narrow and precise application...." *See United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir.1997). Here, Plaintiffs allege that Fidelity defrauded them by making false statements to Defendants as part of Defendants'

---

**13.** Plaintiffs cite two examples: a Texas state court which "found that Fidelity's parent committed fraud against one of its customers" and a federal court in Tampa which "ordered Defendants to produce privileged Fidelity documents ... [under] the crime-fraud exception." Plaintiffs have substantiated neither claim. The Texas state court case is offered with only a case number, without a copy of any opinion, and without any citation to a specific docket entry identifying what ruling to which this Court should refer. And Plaintiffs have not argued why any alleged fraud by a shell company in unrelated litigation is relevant to the inquiry into the applicability of the crime-fraud exception on the facts of this case. Similarly, Plaintiffs have not provided this Court with any of the details of the alleged grand jury investigation nor explained why that matter is "materially similar" to the matter at hand.

**14.** Defendants state that they produced the documents, not as an admission of crime-fraud, but as an exercise of their right to self-defense under Georgia Rule of Professional Responsibility 1.6.

**15.** Plaintiffs also allege that Defendants' conflict letter was "insufficient," because it falsely assured that Defendants only represented Fidelity and OTS on "unrelated" matters. Plaintiffs' Motion to Compel [27] at 7. Plaintiffs have not supplied the Court with any actual evidence upon which to assess whether even a *prima facie* showing has been made vis-à-vis this accusation. Moreover, Plaintiffs have not shown, and the Court cannot find, that as a matter of law this would trigger the crime-fraud exception. Even assuming that Defendants misstated or even outright lied about the conflict, that is not attributed to Fidelity. And it does not explain how earlier communications between Fidelity and Defendants—presumably prior to Defendants' failure to disclose their conflict—were in furtherance of a fraud. It would significantly expand the crime-fraud exception if communications between lawyer and client could lose privilege status simply because the lawyer subsequently lied about the conflict when trying to obtain new business.

work on the tax opinion letter. Even if Plaintiffs produced *prima facie* evidence, such a showing would only justify piercing the privilege as to communications in furtherance of this specific fraud. According to Defendants, they have already produced all the documents that relate to Fidelity's insurance transaction and/or to the factual representations that Defendants later found to be untrue. Plaintiffs in response do not describe with any specificity what documents they are still demanding and why those particular documents should be seen in furtherance of the alleged crime-fraud. The Court has no basis to find that any other documents or categories of documents would be subject to discovery on a crime-fraud theory.[16]

Lastly, Plaintiff's contention that another court's finding of fraud by Fidelity or Fidelity's parent company for "materially similar transactions" to that entered into by Plaintiffs should be considered evidence of fraud in this case has no bearing. A finding by another court is not, itself, evidence of fraud in this case, and the evidence underpinning any such finding by that court is not before this Court.[17] Plaintiffs' Motion to Compel [27] is **DENIED**.

## III. CONCLUSION

For all the above reasons, and as explained further above, the undersigned **ORDERS** that Defendants' Motion to Compel [22] be **GRANTED IN PART** and **DENIED IN PART** and that Plaintiffs' Motion to Compel [27] be **DENIED**.

Finally, the Court notes that Plaintiffs filed briefs and various exhibits in support of their briefs in redacted form and supplied them to the Court in unredacted form by courtesy copy. To complete the record, Plaintiffs are **ORDERED** to file with the Court all redacted material in unredacted form. If the parties dispute whether material previously marked as confidential should be filed under seal, the parties may seek relief from the Court pursuant to the procedures outlined in paragraph (v) of the Stipulation and Order of Confidentiality [14].

---

16. Plaintiffs also do not request an *in camera* review of the documents to which the crime-fraud exception might apply.

17. In their Reply Brief, Plaintiffs request for the first time a new form of relief: That the Court order Defendants to produce, for *in camera* review, an order Plaintiffs believe was entered under seal by the United States District Court for the Middle District of Florida. Plaintiffs speculate as to the contents of this order and suggest that the court's findings in that order might sway this Court's assessment of the applicability of the crime-fraud exception on the facts of this case. The Court rejects this request on three grounds.

  First, Plaintiffs requested this relief for the first time in their Reply Brief, denying Defendants an opportunity to respond to the request for *in cam-*

*era* review of the alleged order. Procedurally, Plaintiffs' request is deficient.

  Second, Defendants have stated that they have "already produced to Christenbury every document that it has produced in response to the *grand jury subpoena*." *Defendant's Response in Opposition* [32] at 9. Plaintiffs have not offered any argument why this Court should not take Defendants' statement as true or why the statement does not render Plaintiffs' request moot.

  Third, Plaintiffs have not submitted sufficient evidence to this Court to make a *prima facie* showing of illegal or fraudulent activity, and the holding of another court based on evidence not before this Court and applying the law of another jurisdiction cannot satisfy Plaintiffs' burden.