Jesus CAMACHO, surviving spouse of Stacey Camacho, and Lajean Nichols, as Administratrix of the Estate of Stacey Camacho, Plaintiffs,

v.

NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant.

Civil Action No. 1:11–CV–03111–AT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 3, 2012.

---

Brandon Cathey, Darrell W. Hinson, Swope, Rodante, P.A., for Plaintiffs.

Robert M. Darroch, Stephanie F. Glickauf, Goodman McGuffey Lindsey & Johnson, for Defendant.

### ORDER

AMY TOTENBERG, District Judge.

Pending before the Court is the parties' Joint Brief on Discovery Issues outlining a number of discovery disputes requiring resolution by the Court. This case is before the Court on diversity jurisdiction arising from Nationwide's alleged negligent and bad faith failure to settle claims against its insured in an underlying state court action ultimately resulting in a verdict in favor of Plaintiffs in excess of the insurance policy limits. Following the jury's verdict in the state court wrongful death suit, Nationwide's insured, Seung C. Park, assigned his claims for negligent and bad faith failure to settle against Nationwide to the Plaintiffs, who in turn filed their Compliant against Nationwide in this Court on September 14, 2011.

The discovery disputes presented by the parties relate to the following: (1) Plaintiffs' request for Nationwide's complete claim file (including communications with its in-house "claims counsel" and its outside litigation counsel) relating to the Plaintiffs' tort claims against Nationwide's insured, Mr. Park, arising from the death of Stacey Camacho; (2) Plaintiffs' attempt to obtain information regarding Nationwide's handling of the Stacey Camacho claim during depositions of the claims adjusters; (3) Nationwide's requests for communications between Plaintiffs and their trial counsel in the underlying state court action related to the settlement offer

(including documents containing the mental impressions of the attorneys); and (4) Nationwide's request for a protective order limiting Sharon Wilson's deposition to seven hours.

The Court has conducted a number of telephone conferences with the parties in an attempt to resolve these issues. The Court ordered Nationwide to produce the claims file for in camera review and ordered the parties to proceed with the depositions of the claims adjusters to determine whether the information Plaintiff sought could be obtained from those individuals without the need to depose Nationwide's in-house claims counsel, Russell Roddy. The Court has also discussed with the parties the impact of Jacob Camacho's unresolved claims against Mr. Park on Plaintiffs' current third-party bad faith claim against Nationwide. After multiple extensions of discovery, and the failed attempts by the parties to resolve some of these disputes without the Court's intervention, the parties submitted the Joint Brief on Discovery now before the Court.[1] The Court's rulings are set forth below.

## I. PLAINTIFFS' REQUEST FOR NATIONWIDE'S ENTIRE CLAIMS FILE AND DEPOSITIONS OF IN–HOUSE CLAIMS COUNSEL AND CLAIMS ADJUSTERS

Plaintiffs seek all materials within Nationwide's claims file relating to their claims for damages against Mr. Park arising from the death of Stacey Camacho up to and including the date when the judgment became final on March 7, 2011.[2] The assignment agreement between Plaintiffs and Mr. Park contains the following waiver provisions:

Park also hereby waives both his attorney-client privilege and the protection provided by the work-product doctrine as to all records, activities, communications, and thoughts in the possession of Nationwide or law firm(s) Nationwide hired. He grants Camacho and Camacho's lawyers full authority and permission to review all records, files, and communications in the possession of Nationwide or the law firm(s) Nationwide hired. Park also grants Camacho and Camacho's lawyers full authority to interview all claims professionals at Nationwide and the law firm(s) Nationwide hired.

(Ex. B to Compl. at 2.) Nationwide objects to Plaintiffs' request on the grounds that certain information contained in the claims file is: (1) protected by attorney-client privilege; (2) protected by the work product doctrine; and (3) contains information outside the relevant time frame for establishing bad faith on the part of Nationwide.

### A. Attorney-client privilege

■ Whether documents are protected by the attorney-client privilege is a substantive issue governed by state law. *See Underwriters Ins. Co. v. Atlanta Gas Light Co.*, 248 F.R.D. 663, 667, 670 (N.D.Ga.2008) (Carnes, J.) (citing *GAB Bus. Serv., Inc. v. Syndicate 627*, 809 F.2d 755, 762 (11th Cir.1987) ("state law determines privilege when state law supplies rule of decision") and *Shipes v. BIC Corp.*, 154 F.R.D. 301, 305 (M.D.Ga.1994)).

■ Plaintiffs assert that no attorney-client privilege exists when an attorney represents both the insurer and the insured.[3]

1. The Court also considers the parties' previous discovery submissions regarding these issues.

2. Nationwide objects to producing any information related to the claim of Jacob Camacho that was dismissed prior to the jury verdict in the underlying state court action. Plaintiffs previously agreed in a tele-conference with the Court that documents in Nationwide's claims file regarding the Jacob Camacho claim are not relevant to Nationwide's alleged bad faith failure to settle claims arising out of the death of Stacey Camacho. Accordingly, Nationwide may redact information related solely to its treatment of Jacob Camacho's claim. To the extent that Nationwide's activity log contains entries where Nationwide's evaluation of the claims related to Stacey Camacho are intermeshed with its evaluation of the Jacob Camacho claim and it is not possible to separate out the two claims, Nationwide must produce the documents unless the information is clearly privileged.

3. There is no Georgia case exactly on point that expressly supports Plaintiffs' assertion, and Plaintiffs rely on cases from other jurisdictions. However, as Georgia courts follow the same foundation legal principles as the state courts on which Plaintiffs rely regarding the attorney-client privilege, the reasoning of those courts is persuasive.

The purpose of the attorney-client privilege is to protect and benefit the client by securing the client's confidence in the secrecy of the communication, thereby increasing the freedom of consultation so the attorney will act with full understanding of the matter in which he or she is employed. *E.g., Marriott Corp. v. American Academy of Psychotherapists, Inc.,* 157 Ga.App. 497, 277 S.E.2d 785 (1981). In Georgia, the attorney-client privilege is to be narrowly construed. *Bryant v. State,* 282 Ga. 631, 651 S.E.2d 718 (2007); *Tenet Healthcare Corporation v. Louisiana Forum Corporation,* 273 Ga. 206, 538 S.E.2d 441 (2000); *Ostroff v. Coyner,* 187 Ga.App. 109, 369 S.E.2d 298 (1988). Inasmuch as the exercise of the attorney-client privilege results in the exclusion of evidence, a narrow construction of the privilege comports with the view that the ascertainment of as many facts as possible leads to the truth, the discovery of which is the object of all legal investigation. *Bryant,* 651 S.E.2d at 720; *Tenet Healthcare,* 538 S.E.2d 441.

▇▇▇ The attorney-client privilege belongs to the client and the privilege is solely the client's to waive. *Peterson v. Baumwell,* 202 Ga.App. 283, 414 S.E.2d 278, 280 (1992); *Waldrip v. Head,* 272 Ga. 572, 532 S.E.2d 380 (2000). Under Georgia law a well-recognized exception to the exclusion of evidence based on attorney-client privilege exists in situations in which the attorney jointly represented two or more clients whose interests subsequently become adverse. *Id.; see, e.g., Spence v. Hamm,* 226 Ga.App. 357, 487 S.E.2d 9 (1997).

> If two or more persons jointly consult [or retain] an attorney the communications which either makes to the attorney are not privileged in the event of any subsequent litigation between the parties. In such situations it is considered that the attorney does not have an attorney-client relationship with either of the joint parties.

*Id.* (quoting *Gearhart v. Etheridge,* 232 Ga. 638, 208 S.E.2d 460 (1974)). In the case of *Peterson v. Baumwell,* the Georgia Court of Appeals found instructive the Wisconsin Supreme Court's application of the joint-attorney exception in a situation comparable to the instant one, where the information revealed would be unfavorable to the former client vis-à-vis his position to another party in the litigation who is a stranger to the former attorney-client relationship. 414 S.E.2d at 281 (citing *Hoffman v. Labutzke,* 233 Wis. 365, 289 N.W. 652 (1940) (applying joint-attorney exception in deeming attorney-client privilege waived in situation where insurer and insured had been jointly represented before and throughout trial and reasoning that "when one party consents [to joint representation], his privilege under the statute 'is waived' ")).

Although no Georgia court has yet to expressly hold that the privilege vanishes when the same attorney represents both the insurer and the insured under the joint-defense exception, several courts including in Florida, North Carolina, and Iowa have held in the context of a claim for third-party bad faith by an insured against her insurer that the protection of the attorney-client privilege did not apply. *See, e.g., Cozort v. State Farm Mutual Auto. Ins. Co.,* 233 F.R.D. 674 (M.D.Fla. 2005) (holding that under Florida law, the entire claim file from an underlying coverage cause of action is discoverable in a subsequent bad faith action because Florida recognizes no privileges or limitation with respect to claim file materials in such an action); *Nationwide Mut. Fire Ins. Co. v. Bourlon,* 172 N.C.App. 595, 617 S.E.2d 40 (2005) (concluding that a tripartite attorney-client relationship existed whereby the lawyer hired to defend an insured represented both the insurer and the insured and that the common interest or joint client doctrine applies to the context of insurance litigation such that communications are not privileged as between the insurer and the insured); *Henke v. Iowa Home Mutual Cas. Co.,* 249 Iowa 614, 87 N.W.2d 920 (Iowa 1958) (holding that communications between an insurer and the attorney employed by the insurer to defend the insured were not privileged because the defense attorney represented both parties).

The North Carolina Court of Appeal's holding in *Nationwide Mut. Fire Ins. Co. v. Bourlon,*[4] was based on two rationales that

---

**4.** · In *Underwriters Ins. Co. v. Atlanta Gas Light Co.,* 248 F.R.D. 663, 671 (N.D.Ga.2008) (Carnes,

are both found in Georgia law: (1) because the attorney-client privilege may result in the exclusion of evidence which is otherwise relevant and material it should be strictly construed to limit it to the purpose for which it exists "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice," and (2) recognition of the common interest or joint client doctrine as an exception to the attorney-client privilege. Although the *Bourlon* court found that the common interest or joint client doctrine applies in the context of insurance litigation, it went on to note that such an application

"does not lead to the conclusion that all of the communications between [the insured] and [the attorney] were unprivileged. Instead, the attorney-client privilege still attaches to those communications unrelated to the defense of the underlying action, as well as those communications regarding issues adverse between the insurer and the insured. Specifically, "[c]ommunications that relate to an issue of coverage ... are

not discoverable ... because the interests of the insurer and its insured with respect to the issue of coverage are always adverse."

617 S.E.2d at 47 (quoting *North River Ins. v. Philadelphia Reinsurance,* 797 F.Supp. 363, 367 (D.N.J.1992)).

■■■ The Court finds that the joint defense/common interest doctrine applies here, and Nationwide cannot claim the protection of the attorney-client privilege over its communications with Hawkins & Parnell regarding the defense of its insured in the underlying action unrelated to the issue of coverage. Such communications are therefore discoverable in this third-party bad faith action, and Nationwide's objection to the production of documents as being protected by the attorney-client privileged is overruled. However, the Court cannot reach the same conclusion regarding Nationwide's communications with its in-house claims counsel involving the rendering of legal services as there is no presumption that in-house counsel is employed to represent the interests of the insured as opposed to the insurer.[5] Accordingly, Na-

J.), Judge Carnes cited *Bourlon* regarding the existence of a tripartite attorney-client relationship in situations where the insurance company hires an attorney to represent the insured.

**5.** The Court of Appeals of North Carolina noted in *Bourlon* that "[i]n construing the effect of the tripartite relationship between an attorney, an insurer, and an insured, several courts across the country have held that the 'common interest' or 'joint client' doctrine applies. Under this doctrine, communications between the insured and the retained attorney are not privileged to the extent that they relate to the defense for which the insurer has retained the attorney." 617 S.E.2d at 46 (citing *Northwood Nursing & Convalescent Home, Inc. v. Continental Ins. Co.,* 161 F.R.D. 293, 297 (E.D.Pa.1995) ("Because [the insurer] has agreed to defend this action, [the insureds] have no reasonable expectation of privilege."); *North River Ins. v. Philadelphia Reinsurance,* 797 F.Supp. 363, 366 (D.N.J.1992) ("The common interest doctrine has been recognized in the insured/insurer context when counsel has been retained or paid for by the insurer, and allows either party to obtain attorney-client communications related to the underlying facts giving rise to the claim, because the interests of the insured and insurer in defeating the third-party claim against the insured are so close that 'no reasonable expectation of confidentiality' is said to exist." (citation omitted)); *Pittston Co. v. Allianz Ins. Co.,* 143 F.R.D. 66, 69 (D.N.J.1992) ("It seems clear that use of the [common interest]

doctrine is warranted when there is a dispute between [an] insurer and [an] insured regarding underlying litigation in which the insured was represented by an attorney appointed by the insurer."); *Waste Management, Inc. v. International Surplus Lines Ins. Co.,* 144 Ill.2d 178, 193, 161 Ill.Dec. 774, 579 N.E.2d 322, 328 (1991) (holding that common interest doctrine applies as between insurer and insured); *Brasseaux v. Girouard,* 214 So.2d 401, 410 (recognizing that in suits between an insurer and an insured, communications made by the insured to the insurer's counsel during a period of simultaneous representation are not privileged where the issue to which the communications relate concerns matters of the legal representation of the insured), *cert. denied,* 253 La. 60, 216 So.2d 307 (1968); *Goldberg v. American Home Assurance Co.,* 80 A.D.2d 409, 413, 439 N.Y.S.2d 2, 5 (1981) (common interest doctrine "especially" applies "where an insured and his insurer initially have a common interest in defending an action against the former[.]"). *See also* 81 Am.Jur.2d Witnesses § 434 (2004) ("When an insurer, as required by its contract of insurance, employs counsel to defend its insured, any communication with the lawyer concerning the handling of the claim against the insured is necessarily a matter of common interest to both the insured and the insurer, and the attorney-client privilege is inapplicable.")).

tionwide's communications with its in-house claims counsel are subject to the attorney-client privilege. However, communications between Nationwide's in-house counsel and Hawkins & Parnell (or communications between Nationwide and its in-house counsel during which counsel from Hawkins & Parnell were present) are not privileged and are discoverable by Plaintiffs standing in the shoes of Mr. Park.

### B. Work Product Privilege

■ Unlike the attorney-client privilege, the scope of protection provided by the work product doctrine is a procedural question and thus governed by federal as opposed to state law in a diversity action. *See Underwriters Ins. Co. v. Atlanta Gas Light Co.,* 248 F.R.D. at 667 (citing *Shipes,* 154 F.R.D. at 305 (whereas privileges are substantive issues determined by state law, work product doctrine is not a substantive privilege)). The work product privilege provides a qualified immunity for materials prepared in anticipation of litigation by a party, an attorney, or other representatives of the party. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Rule 26(b)(3)(A)(ii) protects from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)" unless the requesting party "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R.Civ.P. 26(b)(3)(A)(ii).

■ Nationwide asserts its claims file was created in anticipation of litigation of claims arising out of the car accident that resulted in the death of Stacey Camacho. Insurance claim files generally do not constitute work product in the early stages of investigation, when the insurance company is primarily concerned with "deciding whether to resist the claim, to reimburse the insured and seek subrogation ... or to reimburse the insured and forget about the claim thereafter." *Underwriters Ins. Co. v. Atlanta Gas Light Co.,* 248 F.R.D. at 667 (quoting *Carver*

*v. Allstate Ins. Co.,* 94 F.R.D. 131, 134 (S.D.Ga.1982)). As the court explained in *Carver,* claim files "straddle both ends of this definition, because it is the ordinary course of business for an insurance company to investigate a claim with an eye toward litigation." 94 F.R.D. at 134. Once litigation is imminent, however, the claims investigation file is maintained "in anticipation of litigation" and its contents are protected by the work product doctrine. *Underwriters Ins. Co. v. Atlanta Gas Light Co.,* 248 F.R.D. at 667; *see also Lett v. State Farm Fire & Cas. Co.,* 115 F.R.D. 501, 503 (N.D.Ga.1987) (Forrester, J.) (finding that reports prepared after a claim was reassigned from a regular representative to a senior representative, due to the company's suspicion of fraud, were protected by the work product doctrine).

■ Where an underlying third party liability claim is involved, the federal courts have generally recognized:

> [W]hen a liability insurer investigates a third party claim, the investigation is made in anticipation of claims, which, if denied, likely will lead to litigation. For this reason it is logical to conclude that, while files generated in relation to first party claims are made in the ordinary course of business and are discoverable, files generated during the investigation of third party claims are made in anticipation of litigation and are not discoverable.

*Underwriters Ins. Co. v. Atlanta Gas Light Co.,* 248 F.R.D. at 668 (citing cases). However, the insurance claim file may be discoverable in a third party claim for bad faith if the plaintiff can show a "substantial need of the materials" and an inability "without undue hardship" to obtain the materials by other means. *Id.; Joyner v. Continental Ins. Companies,* 101 F.R.D. 414 (S.D.Ga.1983); *In re International Horizons, Inc.,* 28 B.R. 97 (N.D.Ga.1983); *see also Atlanta Coca-Cola Bottling Co. v. Transamerica Ins. Co.,* 61 F.R.D. 115 (N.D.Ga.1972) (holding that investigation reports made before the denial of claim by insurance company were not prepared in anticipation of litigation and were

therefore discoverable).[6]

As the district court recognized in *Underwriters Ins. Co. v. Atlanta Gas Light Co.*, a plaintiff's need for the information in the insurance company's claim file in a third party bad faith claim such as this one is substantial because the documents in the file are often the only reliable indication of whether the insurance company acted in bad faith. 248 F.R.D. at 669; *accord Joyner*, 101 F.R.D. at 416 (noting that the claim file "take[s] on additional relevance" in a bad faith claim). Nonetheless, although plaintiffs may be entitled to production of the documents, courts in this circuit will not compel the insurer to disclose mental impressions of its attorney or other representatives. *Underwriters Ins. Co. v. Atlanta Gas Light Co.*, 248 F.R.D. at 669; *Joyner*, 101 F.R.D. at 417; Fed.R.Civ.P. 26(b)(3) (providing that when the Court orders discovery of materials prepared by a party in anticipation of litigation, it *must* protect against disclosure of the "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.")

Nationwide previously produced to the Court for in camera inspection a copy of the documents it withheld from production to Plaintiffs with highlighted portions of the documents Nationwide contends contain the

protected mental impressions, conclusions, opinions, or legal theories.[7] The Court finds that, in an attempt to "walk a fine line" with respect to the protection of privileged information, Nationwide has painted too broad a stroke over its claims file in asserting that certain information constitutes opinion work product as demonstrated by the following examples. First, Nationwide seeks to redact as work product portions of its Activity Log with Bates Numbers NW000037–39, NW000066–69, 000237–242, 246–247, 249–57, despite the fact that Nationwide did not identify these documents as containing protected work product on its privilege log. Second, Nationwide attempts to assert work product protection over summaries of some communications between Hawkins & Parnell and its insured, Mr. Park. *See* NW000012, 000014, 000016, 000024,[8] 000037–39. Third, Nationwide has attempted to assert the work product privilege over emails and other communications between Hawkins & Parnell and the Nationwide Claims Specialists that do not contain any evidence of Nationwide's in-house legal strategies. *See* NW000066–69.

■ Accordingly, in ordering the production of its claims file to Plaintiffs, the Court will permit Nationwide to redact the mental impressions, conclusions, opinions, or legal theories of counsel and the insurance repre-

---

**6.** A number of federal courts have followed the lead of the Supreme Court of Arizona in *Brown v. Superior Court*, 137 Ariz. 327, 670 P.2d 725 (1983) in finding that a claim file is so integral to proving bad faith that an insured can meet the "substantial need" burden. *Id.* at 668–69 (finding the plaintiff's need to be substantial where the documents in the file are the only reliable indication of whether the alleged bad faith occurred as opposed to attempting to obtain the information through depositions of claims representatives) (citing *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 576 (9th Cir.1992); *Dion v. Nationwide Mut. Ins. Co.*, 185 F.R.D. 288, 293 (D.Mont.1998); and *In re Bergeson*, 112 F.R.D. 692, 697 (D.Mont.1986)). The Montana district court, quoting *Brown*, observed that:

> [B]ad faith actions against an insurer, like actions by client against attorney, [or] patient against doctor, can only be proved by showing exactly how the company processed the claim, how thoroughly it was considered and why the company took the action it did. The claims file is a unique, contemporaneously prepared history of the company's handling of the claim; in an action such as this the need for the

information in the file is not only substantial, but overwhelming.

*In re Bergeson*, 112 F.R.D. at 697 (quoting *Brown*, 670 P.2d at 734).

**7.** As the party asserting the work product privilege, Nationwide bears the burden of establishing its application over the documents Nationwide seeks to protect. *See Carnes v. Crete Carrier Corp.*, 244 F.R.D. 694, 697 (N.D.Ga.2007). The work product privilege "must be specifically raised and demonstrated rather than asserted in a blanket fashion." *Carnes*, 244 F.R.D. at 698. Other than indicating in its privilege log that certain entries in its Activity Log were created in anticipation of litigation and making a generic argument as to the applicability of the work product doctrine, Nationwide has done little to satisfy its burden of proof.

**8.** Notably, on page NW000024, the communication summary that Nationwide contends is protected appears twice on the page, once with a highlight (i.e. to be redacted prior to production to Plaintiffs) and once without (i.e. not to be redacted prior to production to Plaintiffs).

sentatives handling the Plaintiffs' underlying damage claims from the documents. *See Underwriters Ins. Co. v. Atlanta Gas Light Co.*, 248 F.R.D. at 670–71 (permitting insurance company to redact "mental impressions, conclusions, opinions, or legal theories" of its investigators or its attorneys before producing any documents in its claim file to third-party plaintiff); *Joyner*, 101 F.R.D. at 417 (same). The Court cautions Nationwide to engage in this process in good faith and to redact only the portions of its claims file necessary to protect against disclosure of its legal strategies in defending the underlying lawsuit. *Id.* (noting that "[a] free exchange of discovery is necessary to reach a fair and just conclusion to this dispute. This Court will not hesitate to impose severe sanctions for litigation which is inconsistent with the goals of modern discovery. F.R.C.P. Rule 37.")

The Court recognizes that the documents Plaintiffs seek contain a mixture of privileged "mental impressions" and discoverable information. However, "Rule 26(b)(3)'s work product protection 'furnishes no shield against discovery,' by interrogatory and deposition, of the facts that an adverse party's representative has amassed and accumulated in documents prepared for litigation." *Joyner*, 101 F.R.D. at 417 (quoting 8 Wright & Miller, Federal Practice & Procedure: Civil § 2023 (1970)); *Pahl v. Robinson*, No. 4:08–CV–112 CDL, 2009 WL 1097962, *2 n. 3 (M.D.Ga. Apr. 22, 2009) (finding that plaintiffs could seek testimony from defendant regarding facts and circumstances of underlying automobile accident). Therefore, Plaintiffs are entitled to depose Nationwide's in-surance representatives regarding the facts Nationwide had knowledge of and considered in its investigation and handling of the Camacho wrongful death claim.

### C. *Relevant Time Frame*

Nationwide has withheld the portion of its claims file originating after May 1, 2006, on the basis that the relevant time period for Plaintiffs' bad faith claim is limited to the date of the inception of the underlying claim until the date of Nationwide's refusal to accept the offer to settle the claim within the policy limits.[9] In support of its argument that conduct subsequent to its failure to settle pursuant to a time-limited demand is irrelevant and inadmissible, Nationwide relies on cases it contends "focus on the insurer's decision to settle a case based on the evaluation of information available to it at the time of the opportunity to settle within its limits." *See Southern Gen. Ins. Co. v. Holt*, 262 Ga. 267, 416 S.E.2d 274 (1992); *see also Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 580 S.E.2d 519 (2003). The Court does not find Georgia law to be so clearly established in Nationwide's favor on this issue.

In *Holt*, the Supreme Court of Georgia held that "[a]n insurance company does not act in bad faith solely because it fails to accept a settlement offer within the deadline set by the injured person's attorney" because otherwise a plaintiff's attorney could "set up" an insurer for an excess judgment merely by imposing an unreasonably short response time to a settlement offer. 416 S.E.2d at 276 (citing *Grumbling v. Medallion Ins. Co.*, 392

---

**9.** In addition, Nationwide asserts that "any materials, documents or information regarding Nationwide's training, claims handling, or practices," and "any evidence of how Nationwide handled claims after the subject claim" are irrelevant because evidence of similar or subsequent acts, omissions, or remedial measures are inadmissible. Neither party has specifically identified requests for such information as being the subject of the pending discovery dispute before the Court as instructed. Nonetheless, the Court notes that such information is likely relevant in this case. *See Moses v. State Farm Mut. Auto. Ins. Co.*, 104 F.R.D. 55, 57 (N.D.Ga.1984); (ordering production of insurer's instructions, procedures, policies, or rules for its officers/agents involved in handling claims but limiting scope of request to claims brought in Georgia); *Southard v. State Farm Fire and Cas. Co.*, No. CV411–243, 2012 WL 2191651 (S.D.Ga. June 14, 2012) (Smith, J.) (noting that "the relevancy standard for discovery is not the same as for at-trial evidence" and citing cases allowing discovery of "evidence of the [insurer's] practices concerning and its treatment of similar claims" including information "about how an insurer trains its employees to minimize losses while adjusting claims"); *Pepperwood of Naples Condominium Ass'n v. Nationwide Mutual Fire Ins. Co.*, No. 2:10–cv–753, 2011 WL 4596060, *13 (M.D.Fla. Oct. 3, 2011) (Chappell, J.) (ordering disclosure of insurer's employee handbooks for adjusters and supervisors who worked on the plaintiff's claims during the relevant time period.)

F.Supp. 717, 721 (D.Or.1975)). The *Holt* Court, however, rejected the insurer's argument that "an insurance company has no duty to its insured to respond to a deadline to settle a claim within policy limits when the company has knowledge of clear liability and special damages exceeding the policy limits," and found that despite the insurer's contention, "its liability is not based solely on its failure to settle [the] claim within the time frame that her attorney set." *Id.*

Nationwide further relies on *Cotton States Mut. Ins. Co. v. Brightman,* for the general proposition that an insurer does not have an affirmative duty to engage in negotiations concerning a settlement demand that is in excess of the insurance policy's limits. The case in *Cotton States* also involved an insurer's failure to respond within a specific time limit, but it presented an additional issue concerning the insurer's opportunity to accept the plaintiff's offer to settle. 580 S.E.2d at 521. Whereas only one insurance company was involved in *Holt,* the plaintiff's settlement offer in Cotton States involved two defendants and their insurance companies. *Id.* The Supreme Court in *Cotton States* held that "an insurance company faced with a demand involving multiple insurers can create a safe harbor from liability for an insured's bad faith claim under *Holt* by meeting the portion of the demand over which it has control, thus doing what it can to effectuate the settlement of the claims against its insured." *Id.* at 522. In concluding that the insurer was not entitled to a directed verdict based on the evidence at trial that the insurer had an adequate opportunity to settle and therefore acted unreasonably in refusing to tender its policy limits in response to the plaintiff's settlement offer, the Supreme Court noted is disagreement with the Court of Appeals decision placing an affirmative duty on the company to engage in negotiations concerning a settlement demand that is in excess of the insurance policy's limits. *Id.* However, the *Brightman* Court

> disapproved only of the inflexible rule that there always is an affirmative duty on the part of the insurer to (i) respond to a settlement offer outside the policy limits, and (ii) make a counter-offer to every settlement demand it receives. The opinion

does not resolve the ambiguity under Georgia law regarding what role an offer of settlement within the policy limits from the plaintiff plays in determining whether an insurer was negligent in failing to offer the limits of a policy to resolve a claim against an insured.

*Kingsley v. State Farm Mut. Auto. Ins. Co.,* 353 F.Supp.2d 1242, 1249 (N.D.Ga.2005) *aff'd,* 153 Fed.Appx. 555 (11th Cir.2005).

The district court in *Kingsley* recognized the lack of clarity in Georgia cases while addressing what conduct on the part of the insurer constitutes bad faith as follows:

> Fundamental to the decisions in these cases was that the insurer at some point knew there was an opportunity to settle within the policy limits, because it received a policy-limits settlement offer from the plaintiff, or at the very least knew the opportunity to settle within the policy limits would close because of the passage of a settlement deadline communicated by the plaintiff or the entry of a final judgment in the underlying action.... Thus, a careful reading of the law in Georgia discloses that an insurer will be exposed to a judgment in excess of its policy limits only where there is some certainty regarding the settlement posture of the parties in the underlying lawsuit—i.e., where the insured's liability is clear, the damages are great and the insurer is on notice that it has an opportunity to settle the case, usually because a settlement demand in the amount of the policy limits or greater is received from the plaintiff. There must be a triggering event—something that puts the insurer on notice that it must respond or risk liability for an excess judgment. Put another way, to find liability for tortious refusal to settle there must be something the insurer was required to "refuse."

353 F.Supp.2d 1242, 1251 (N.D.Ga.2005) (rejecting the insurer's argument that it may not be held per se liable for tortious refusal to settle in the absence of a settlement demand from the plaintiff but finding that the plaintiff's "secret" deadline deprived insurer of notice of an opportunity to settle within the policy limits required under Georgia law

as a predicate to liability); *see also Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1550 (11th Cir.1991) ("At a minimum ... Georgia law mandates that the insured show that settlement was possible—the case could have been settled within the policy limits-and that the insurer knew, or reasonably should have known, of this fact."); *Thomas v. Atlanta Casualty Co.*, 253 Ga. App. 199, 558 S.E.2d 432, 439 (2001), *cert. denied* (Apr. 29, 2002) (reversing grant of summary judgment to insurer on insured's claim for tortious refusal to settle based on the insurer's failure to negotiate settlement after a default judgment was entered against the insured).

■ Nationwide has cited no actual authority, and this Court has found none, to support its position that the relevant time period for demonstrating its alleged bad-faith conduct ends at Nationwide's initial rejection of Plaintiffs' offer of settlement. To the contrary, under Georgia law, "the factors to be considered in determining whether an insurer has exercised ordinary care in deciding whether to settle or defend a claim are whether there has been a reasonable valuation of the case and whether, at each stage, rejections of settlement demands were consciously made in terms of deliberative judgment and evaluation, as opposed to rejections based on other or no reasons." 16 Ga. Jur. Insurance § 19:1 (citing *Smoot v. State Farm Mut. Auto. Ins. Co.*, 299 F.2d 525, 531 (5th Cir.1962)). Moreover, the reasonableness of an insurer's response in a bad faith failure to settle claim depends on the totality of the circumstances and is a question for the jury. *See Butler v. First Acceptance Ins. Co., Inc.*, 652 F.Supp.2d 1264, 1277 (N.D.Ga.2009). Accordingly, Nationwide is ordered to produce its entire claims file, including documents originating after the May 1, 2006 rejection of Plaintiffs' offer of settlement.

## II. NATIONWIDE'S REQUEST FOR PLAINTIFFS' ATTORNEY–CLIENT COMMUNICATIONS AND WORK PRODUCT

■ In the true spirit of the proverbial argument "what's good for the goose is good for the gander," Nationwide asserts that it "is entitled to the communications between Plaintiffs and Charles McAleer, Plaintiffs' attorney in the underlying tort suit [and] McAleer's mental impressions related to the demand and issues surrounding settlement of the underlying action." Nationwide contends that Plaintiffs have waived the attorney-client privilege merely by filing the instant bad faith action, "which centers on a demand letter drafted and sent by McAleer," relying on general case law discussing the "offensive use/implied waiver doctrine" in contexts other than third-party bad faith failure to settle litigation. *See Christenbury v. Locke Lord Bissell & Liddell, LLP*, 285 F.R.D. 675, 681–82 (N.D.Ga.2012) (Anand, M.J.) (applying implied waiver of attorney-client privilege to plaintiff's professional malpractice claim). According to Nationwide, the motive behind the plaintiff's settlement demand is relevant and vital to the defense of a third-party bad faith claim in light of the Georgia Supreme Court's statement in *Southern General Ins. Co. v. Holt* that its decision should not be read to "mean that a plaintiff's attorney ... could set up an insurer for an excess judgment merely by offering to settle within the policy limits and by imposing an unreasonably short time within which the offer would remain open." 416 S.E.2d 274, 276 (Ga. 1992). The Court is unpersuaded by Nationwide's argument on this issue.

At least one court in this circuit has addressed this issue and expressly ruled against the position taken by Nationwide here.[10] In *State Auto Property and Cas. Co.*

**10.** In *Tolz v. Geico*, No. 08–80663, 2010 WL 384745 (S.D.Fla. Jan. 27, 2010) (Marra, J.), a case involving Florida law in the context of a bad faith failure to settle action, the defendant insurance company made a similar argument with respect to its request seeking the production of the litigation files maintained by counsel for the plaintiffs in the underlying case, including documents related to the formulation and presentation of the plaintiffs' settlement demands and

offers. The insurer raised as an affirmative defense that the plaintiffs unreasonably refused to accept its tender of the policy limits and argued that the mental state, thoughts, and impressions of the plaintiff and her attorneys during the time prior to her rejection of the insurer's tender of its policy limits are a central issue in the instant action because they are the best evidence of whether the insurer had a realistic opportunity to settle the claim within the policy limits. *Id.* at

*v. Griffin,* the district court for the Middle District of Georgia quashed an insurance company's subpoena requesting attorney-client communications of its insured in underlying litigation, holding that the motivation of the plaintiff's counsel in sending a settlement demand is not relevant to the issue of whether the insurer acted in bad faith in its handling of the claims presented to it. No. 4:11–CV–14(CDL), 2012 WL 1940797, *2 (M.D.Ga. May 29, 2012) (Land, J.) (noting that insurance company did not cite any holding of any Georgia appellate court that supports its "set up" theory). In *Griffin* the court explained that because the pertinent issue for determination in a bad faith failure to settle action is the conduct of the insurance company, the Court could not "conceive of how correspondence between counsel for the injured parties who obtained judgments in excess of the insured's policy limits could be relevant to a subsequent bad faith failure to settle claim against the insurance company by its insured." *Id.* The Court went on to state that the Georgia Supreme Court's statement regarding a "set up" in *Holt* does not make the subjective intent of the plaintiffs or their attorneys relevant to the determination of bad faith on the part of the insurance company; rather "[i]t simply indicates that the imposition of an unreasonably short time within which an offer to settle would remain open is a relevant factor in evaluating whether the insurance company acted unreason-

ably in failing to accept such an offer." *Id.* The court in *Griffin* recognized that "the result of [the plaintiff's] motivation, such as an unreasonably short deadline, may be relevant," but found that "[i]t is relevant not because the insured or its counsel was attempting to 'set up' the insurance company but because the amount of time that the insurance company was given to respond to an offer of settlement goes directly to the insurance company's conduct and the constraints on its ability to respond." *Id.*

The Court finds the reasoning in *Griffin* to be persuasive. In *Holt,* the Georgia Supreme Court held that "[a]n insurance company does not act in bad faith solely because it fails to accept a settlement offer within the deadline set by the injured person's attorney." 416 S.E.2d at 276 (stating that the issue is not whether the insurance company has a duty to its insured to respond to a deadline to settle, but whether all the facts show sufficient evidence to permit a jury to determine whether the insurer acted unreasonably in declining to accept a time-limited settlement offer). Thus, it reasonably follows that the inclusion of a short deadline in a time-limit settlement demand is not evidence, on its own, of a bad faith action "set up" by the plaintiff. Nationwide has failed to demonstrate extraordinary circumstances warranting the disclosure of protected information.[11] Accordingly, Nationwide is not en-

*1. The district court, in overruling the magistrate judge's determination that the attorney-client privilege was waived due to "issue injection," found that the facts of the case were similar to those in *Lee v. Progressive Express Ins. Co.,* where the insurer sought discovery of attorney-client communications involving the plaintiff based on a belief that the plaintiff's attorney orchestrated the rejection of the settlement to create a bad faith action. *Id.* In *Lee,* the Florida Appellate Court held that "[t]he motives of [plaintiff] and his attorney regarding the timing of the settlement offer and rejection of [the insurer's] subsequent settlement offer are not elements that [plaintiff] has to prove to establish a bad faith claim against [the insurer.]" 909 So.2d 475, 476 (Fla.Dist.Ct.App.2005). As a result, "[c]ontrary to [the insurer's] argument, [plaintiff] is not the one injecting this issue into litigation. If the insurer raises this as a defense, it has the burden of proving that the claimant was unwilling to settle." *Id.* Relying on *Lee,* the *Tolz* court held that the plaintiff did not inject the issue by suing for bad faith and would thus not be

deemed to have waived its attorney-client privilege merely by doing so. Rather, it was the defendant insurer who injected the issue of the plaintiff's alleged unreasonable refusal to accept the insurer's tender of the policy limits as an affirmative defense.

11. Nationwide's reliance on *United Steelworkers of America, AFL–CIO–CLC v. Ivaco,* No. 1:01–cv–0426–CAP, 2002 WL 31932875 (N.D.Ga. Jan. 13, 2003) (Pannell, J.), in support of its assertion that Plaintiffs waived the protection of the work product privilege over McAleer's mental impressions is misleading and misplaced. First, the Court in *Ivaco* found no waiver of the work product privilege had occurred. *Id.* at *5. Second, *Ivaco* reiterated the Eleventh Circuit's holding in *Cox v. Administrator U.S. Steel & Carnegie,* 17 F.3d 1386, 1422 (11th Cir.1994), that "where the work-product involves the attorney's mental impressions, conclusions, opinions or legal theories, [a showing of substantial need and undue hardship] will not suffice, as this 'opinion work-prod-

titled to discover Plaintiffs' attorney-client communications with McAleer or his mental impressions related to the demand and issues surrounding settlement of the underlying action. However, Nationwide may develop evidence for a defense, consistent with this order, that it was set up for a bad faith action. For example, Nationwide may re-depose Plaintiffs on a time-limited basis solely for the purpose of discovering whether Plaintiffs possess facts, independent from their communications with their attorneys, regarding the terms of the settlement demand, i.e. whether Plaintiffs have any knowledge of the basis underlying the 10 day deadline and whether the demand was made on behalf of the estate or only on behalf of Jesus Camacho as the survivor.[12]

## III. CONCLUSION

Nationwide is ordered to produce its entire claims file, including documents generated after May 1, 2006, to Plaintiffs within TEN (10) days of the date of this Order, subject to the conditions set forth above in Section II(B) with regard to redacting the mental impressions, conclusions, opinions, or legal theories of counsel and the insurance representatives handling the Plaintiffs' underlying damage claims from the documents prior to production. Nationwide may not withhold any documents containing or summarizing communications with the counsel retained to defend its insured, Mr. Park, in the underlying wrongful death suit, on the basis that they are protected by the attorney-client privilege, subject to the conditions set forth above in Section II(A) with regard to communications solely between Nationwide and its in-house claims counsel which remain privileged. Nationwide is not entitled to discover Plaintiffs' attorney-client communications with Charles McAleer or his mental impressions related to the settlement demand and issues surrounding settlement of the underlying action.

Plaintiffs may depose Nationwide's insurance representatives regarding the facts Nationwide had knowledge of and considered in its investigation and handling of the Camacho wrongful death claim.[13] Nationwide may re-depose Plaintiffs for the limited purpose of discovering whether Plaintiffs possess facts, independent from their communications with their attorneys, surrounding the terms of the settlement demand, i.e. whether Plaintiffs have any knowledge of the basis underlying the 10 day deadline and whether the demand was made on behalf of the estate or only on behalf of Jesus Camacho as the survivor.

**IT IS SO ORDERED.**

uct' enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances." *Id.* at * 3 (citing *Cox,* 17 F.3d at 1422).

12. The Court recognizes that this particular line of inquiry may prove fruitless and discourages scheduling a deposition simply for the purpose of conducting one.

13. As Nationwide's request to limit the remainder of its employee Sharon Wilson's deposition to a total of seven (7) hours is unopposed, the request is **GRANTED.** However, to the extent that Plaintiffs need additional time to question Ms. Wilson beyond the remaining 1 hour and 8 minutes regarding the claims file materials the Court has ordered be produced that were previously unavailable to Plaintiffs, the parties are **DIRECTED** to work together to determine a reasonable time before bringing the matter to the Court for resolution. If the parties cannot come to an agreement on a reasonable time limit for the deposition, if necessary, the parties should contact the Courtroom Deputy Clerk to schedule a conference with the Court.