UNITED STATES of America EX REL. , Victor E. BIBBY and Brian J. Donnelly, Relators/Plaintiffs

v.

WELLS FARGO BANK, N.A., individually and as s/b/m with Wells Fargo Home Mortgage, Inc., et al., Defendants.

CIVIL ACTION NO. 1:06–CV–0547–AT

United States District Court, N.D. Georgia, Atlanta Division.

Signed November 16, 2015

Amy L. Berne, Paris A. Wynn, U.S. Attorney's Office, Atlanta, GA, for Plaintiff United States of America Ex Rel.

James Edward Butler, Jr., Robert Henry Snyder, Jr., Butler, Wooten, Cheeley & Peak, LLP, Marlan Bradley Wilbanks, Tyrone M. Bridges, Wilbanks & Gouinlock, Atlanta, GA, Brandon L. Peak, Joseph Marshall Colwell, Butler, Wooten, Cheeley & Peak, LLP, Columbus, GA, Mary Louise Cohen, Phillips & Cohen, LLP, Washington, DC, for Victor E. Bibby and Brian J. Donnelly, Plaintiffs/Relators.

Amy Pritchard Williams, Sara Salehi Ash, K & L Gates, Charlotte, NC, Noam A. Kutler, Lawrence Coe Lanpher, Soyong Cho, K & L Gates, Washington, DC, Charles T. Huddleston, Nelson Mullins Riley & Scarborough, LLP, Atlanta, GA, for Defendants.

## ORDER

Amy Totenberg, United States District Judge

This False Claims Act case centers on Relators' allegations that Wells Fargo Bank, N.A. ("Wells Fargo") engaged in a fraudulent scheme to overcharge veterans on closing costs when those veterans refinanced their mortgages through the United States Veteran's Administration's ("VA") Interest Rate Reduction Refinancing Loan ("IRRRL") program.

The issue before the Court concerns a discovery dispute between Relators and Wells Fargo about two bullet points found in the minutes for a March 25, 2010 meeting of Wells Fargo's "Government/Emerging Market Assessment Group." The two bullet points at issue described, briefly, the factual determinations of a Wells Fargo investigation into whether or not Wells Fargo was charging veterans unallowable closing costs when those veterans refinanced their mortgages through the VA refinance program. The two bullet points, along with the rest of the minutes, had been produced to Relators five times roughly one and a half years ago. The remainder of the minutes describe Wells Fargo's business and remedial efforts to address the problem, and a discussion of other, unrelated issues.

The discovery dispute was ignited when Relators took the deposition of Linda Hembree, a former employee of Wells Fargo who was responsible for closing mortgage loans. (See Doc. 606 at 20.) At Ms. Hembree's deposition, Relators sought to question her concerning the two bullet points.

Wells Fargo objected immediately during the deposition (Doc. 606 at 108), sent a letter (Doc. 613–2) seeking to claw back the document pursuant to the Protective Order in this case (Doc. 337), and then

filed a Motion for Protective Order (Doc. 613). Wells Fargo claims that the individual who presented the two bullet points at the meeting, Rhea Zembower (formerly Rhea Heintz), had been tasked by Wells Fargo's in-house counsel in October of 2009 to lead a confidential internal investigation into the issue of whether veterans were being charged unallowable fees when refinancing into VA IRRRLs. (Decl. of Rhea Zembower, Doc. 613–2 at ¶ 4 ("Zembower Aff.").) This investigation was prompted by Wells Fargo's discovery that a class action lawsuit had been filed against them on behalf of individual veterans who alleged they had been charged unallowable fees. Wells Fargo thus argues that the two bullet points are protected work product, created as a result of litigation. Relators argued, *inter alia*, that that the bullet points were not work product because they were presented in a business meeting and thus had a primarily business purpose. (Doc. 621 at 6, 10–12)

The parties briefed the issue and this Court heard oral argument on the matter at a September 16, 2015 status conference. In addition, Wells Fargo submitted sets of materials *in camera* on September 11th, 22nd, and 25th of 2015 regarding this dispute. These materials included affidavits from several individuals involved in the investigation that resulted in the two bullet points, and e-mails concerning the start date of the investigation.

The Court made a preliminary determination at the September 16, 2015 that the two bullet points are protected fact work product and provided guidance to Relators as to how they could proceed as they sought discovery on the factual issues underlying the two bullet points. (Doc. 630.) This Order more fully memorializes the Court's analysis of this issue, and also addresses whether two e-mails submitted by Wells Fargo *in camera* that predate or were created nearly contemporaneously with the start of the investigation, but which were not sent by or to counsel, are privileged or protected under the work product doctrine.

## I. Discussion

### A. The Work Product Doctrine and Burden–Shifting

■■■ The Court first addresses Wells Fargo's assertion that the two bullet points are protected by the work product doctrine. The work-product doctrine provides a qualified immunity that protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed.R.Civ.P. 26(b)(3)(A). The doctrine has two elements: to be protected under the doctrine, the document "must be (1) produced by an attorney or her agent[1] and (2) created in anticipation of litigation." *Adams v. City of Montgomery*, 282 F.R.D. 627, 633 (2012).

---

1. It is well settled that materials prepared by non-attorney "investigators and other agents" may be entitled to protection if they were created in anticipation of litigation. This is because Rule 26(b)(3)(A) plainly contemplates that materials created by a *"party* or its representative" may be entitled to protection, and because the work product doctrine is "grounded in the realities of litigation in our adversary system." *Adams*, 282 F.R.D. at 633 (citations and quotations omitted). The doctrine acknowledges that attorneys may need to delegate to non-attorneys important and sensitive tasks necessary to prepare a party for the prospect of litigation. *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 149–150 (D.C.Cir.2015) (investigative report produced in anticipation of litigation by non-lawyer may be entitled to protection under work product or privilege doctrines).

Here, Ms. Zembower was tasked to conduct the investigation by in-house counsel, and was thus serving as an agent of an attorney. Thus her status as a non-attorney does not bar materials prepared by her from being protected.

■ The party seeking shelter under the work product doctrine bears the burden of establishing that the documents it seeks to protect were prepared in anticipation of litigation. *See Carnes v. Crete Carrier Corp.*, 244 F.R.D. 694, 697 (N.D.Ga. 2007). This burden may be satisfied through a privilege log and affidavits from counsel, the party, its agents, or its employees, and by any of the traditional ways in which proof is produced in pretrial proceedings. *Id.* at 698.

■ Once the party seeking protection meets its burden of showing that the work product doctrine applies to the items it seeks protection for, the burden shifts to the opposing party to demonstrate the existence of exceptional circumstances for the discovery of otherwise privileged documents. *In re Shell Oil Refinery*, 132 F.R.D. 437, 442 (E.D.La.1990), *clarified by* 134 F.R.D. 148 (E.D.La.1990).

## B. Prepared in Anticipation of Litigation

■ The primary issue here is whether the two bullet points were created "in anticipation of litigation." Fed.R.Civ.P. 26(b)(3)(A). The concept " 'in anticipation of litigation' contains within it two related, but nonetheless distinct, concepts. One is temporal. The other is motivational." 2 EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE 836 (5th ed. 2007) ("EPSTEIN"). To satisfy the temporal requirement of the " 'in anticipation of litigation [requirement]' a document must, obviously, have been prepared before or during the litigation." *Id.*; *see also SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 484–85 (E.D.Pa. 2005) ("a document's date of creation is an important part of the analysis as to whether it was prepared for anticipated or ongoing litigation.")

This temporal component of the "in anticipation of litigation" requirement is met here, as the two bullet points were *created* as the result of an investigation into ongoing litigation. And according to the materials submitted *in camera* by Wells Fargo, that litigation was still pending at the time of the meeting where the bullet points were presented. (*In Camera* Affidavit of Rhea Zembower, Sept. 25, 2015 at ¶ 12.)

However, "[t]he temporal element, standing alone ... is not sufficient. The document or material must also have been prepared *for* litigation and not *for* some other purpose. It is [this] second, [motivational] concept that is determinative." 2 EPSTEIN at 837; *see also U.S. v. Adlman*, 134 F.3d 1194, 1202 (2d Cir.1998) (documents must be prepared "because of" litigation to be entitled to protection); *MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 621 (S.D.Fl.2013) (describing "causation" component of work product test). Under this element, the Court must determine why the documents were created in order to assess the applicability of the work product doctrine. *See Fojtasek v. NCL Ltd.*, 262 F.R.D. 650, 654 (S.D.Fl.2009).

■ Of course, determining a *single* motivating purpose behind the creation of a document will often prove difficult. *In re Grand Jury Subpoena*, 357 F.3d 900, 908 (9th Cir.2004) (when purposes of a document are "profoundly interconnected, the [work product doctrine] analysis is more complicated.") The work product doctrine has evolved to recognize this reality. Courts now readily acknowledge that dual-purpose documents that have both a litigation and non-litigation purpose (or purposes) may still be entitled to protection. *Adams v. City of Montgomery*, 282 F.R.D. 627, 634 (M.D.Ala.2012). To determine the existence and scope of a claim for work product protection, the former Fifth Circuit adopted a "primary motivating purpose" test in *United States v. Davis*, 636

F.2d 1028, 1040 (5th Cir.1981).[2] This test asks whether the primary consideration in the creation of the document was anticipated litigation. Other circuits have adopted a potentially broader "because of" test that asks if, "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared . . . because of the prospect of litigation." *Adlman*, 134 F.3d at 1202 (citing Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 FEDERAL PRACTICE & PROCEDURE § 2024, at 343 (1994) (emphasis removed).

██ Under either standard, a document created because of the prospect of litigation does not lose its protection just because it also serves a secondary, non-litigation purpose. However, documents prepared in the ordinary course of business, pursuant to public requirements unrelated to litigation, or for other non-litigation purposes are not protected if they were not also created "because of" or for use in litigation. *Adams*, 282 F.R.D. at 633 (citation and quotations omitted). This holds true even for documents created as part of an investigation. *Id.* at 634 (not "all [of a] city's internal-affairs investigations [into claims of discrimination] are in anticipation of litigation; nor [could] the city routinely contend such in good faith"); *see also Bridgewater v. Carnival Corp.,* 286 F.R.D. 636, 641–42 (S.D.Fla.2011) (compelling production of incident report concerning cruise ship passenger struck by lightning, because cruise line had "strong business interest" in keeping its passengers safe and report was routinely done for similar incidents).

The *Adams* case is illustrative of the difference between documents created "because of" or "primarily" for litigation, and those created largely for business purposes. In *Adams* a municipality's employ-

ee filed an internal-affairs complaint alleging discrimination, and threatened suit. 282 F.R.D. at 633. The city's attorney tasked a non-attorney with conducting an internal investigation of the complaint. *Id.* at 630–33. In the subsequent suit, the city asserted that documents related to the internal investigation were protected by the work product doctrine. The Court agreed, noting that the attorney that supervised the investigation had raised the potential for litigation and emphasized the need for confidentiality, that the employee's internal affairs complaint had indicated that the employee had already begun legal action, and that the city's internal correspondence concerning the employee's complaint referenced the work product doctrine. *Id.* at 633–34. Although the city routinely conducted internal investigations, which would not always be entitled to work product protection, this *particular* investigation in *Adams* was instigated as a result of a direct threat of litigation, and was protected. *Id.* at 634; *see also Camacho v. Nationwide Mutual Ins. Co.,* 287 F.R.D. 688, 694 (N.D.Ga.2012) (insurance claim files are generally not work product in early stages of investigation, but become work product "[o]nce litigation is imminent.")

██ Here, Wells Fargo's two bullet points for the minutes of the Assessment Group had both a litigation and a business purpose. They had a litigation purpose because they were created as the result of an investigation, under the direction of counsel, prompted by the filing of a lawsuit alleging much the same misconduct as alleged by Relators. The investigation was "undertaken for the express purpose of assisting counsel representing Wells Fargo in the litigation." (Zembower Aff., Doc. 613–2 at ¶ 6.) According to materials submitted *in camera,* the litigation that

---

**2.** *Davis* was decided in February of 1981 and is thus binding in the Eleventh Circuit. *Bon-* ner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981).

prompted Ms. Zembower's investigation continued into 2011, well past the date of her presentation at the March 2010 meeting and the creation of the bullet points at issue. When presenting at the Assessment Group meeting, Ms. Zembower (according to the bullet points) discussed the factual results of her investigation. The bullet points are thus best characterized as a factual synopsis of a protected investigation. *See In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir.2007) ("the result of a factual investigation" is fact work product). This, so far, shows that the two bullet points are fact work product.

Since ongoing litigation prompted the creation of the two bullet points summarizing the contents of an investigation into that litigation, these two bullet points were created "primarily" as a result of litigation and "because of" said litigation—thus satisfying both the "primary motivating purpose" and the "because of" tests. *See Davis*, 636 F.2d at 1040; *Adlman*, 134 F.3d at 1202.

While the protected two bullet points had a litigation purpose, the remainder of the meeting minutes had a business purpose. They show that Wells Fargo was implementing training to address the issues raised by the investigation and litigation, and was making efforts to apprise its employees about what was acceptable or not for VA closing costs. This secondary business purpose does not serve to strip the two bullet points of work product protection. The two bullet points themselves make no reference to a business decision and are confined to the results of the investigation. The factual information in the summary bullets is wholly derived from their original legal investigative purpose; the remainder of the document, which has been produced to Relators, is

business-related. *See Adlman*, 134 F.3d at 1199 (opinion work product does not lose its protected status "merely because it is created in order to assist with a business decision.") The two bullet points are thus protected work product.

## C. Fact Versus Opinion Work Product

■ Also at issue is whether the two bullet points are fact or opinion work product. This issue is important because fact work product is sometimes discoverable if the party seeking production can show substantial need and cannot obtain the material without undue hardship. Fed. R.Civ.P. 26(b)(3)(A)(ii). However, the "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation" are almost always protected, absent (*maybe*) a showing of extreme and critical need or similar circumstance. *See Upjohn Co. v. U.S.*, 449 U.S. 383, 401, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).[3]

The "task of drawing a line between what is fact and what is opinion can at times be frustrating and perplexing." *U.S. v. Clemens*, 793 F.Supp.2d 236, 245 (D.D.C.2011) (citing *Florida House of Representatives v. U.S. Dep't of Commerce*, 961 F.2d 941, 947 (11th Cir.1992). However, case law concerning factual investigations provides guidance.

■ "[F]act work product may encompass factual material including the result of a factual investigation." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d at 183; *FTC v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 778 F.3d 142, 152 (D.C.Cir.2015) (reversing district court's determination that certain investigative documents were opinion work product, as opposed to fact work product because they

---

**3.** As *Upjohn* notes, some courts have held that such mental impressions are *never* discoverable. The *Upjohn* court did not reach the issue. 449 U.S. at 401, 101 S.Ct. 677.

did not reveal "counsel's legal impressions or views of the case"); *see also Director, Office of Thrift Supervision v. Vinson & Elkins, LLP,* 124 F.3d 1304, 1307 (D.C.Cir. 1997) ("purely factual material embedded in attorney notes" may not be opinion work product).

In *Clemens,* the district court found that substantial portions of law firm DLA Piper's interview memoranda were "fact work product" and could thus be disclosed based on a showing of substantial need, because the specific facts and circumstances of that case showed that the law firm was not "sharply focus[ing] or weed[ing]" the materials in such a way that would reveal the firm's critical mental impressions. 793 F.Supp.2d at 260. The Court noted that an investigation or interview that "encourage[s] a fairly wide-ranging disclosure ... so as to be sure that any nascent focus on the lawyer's part did not inhibit the client's disclosures" is more likely to result in fact work product than opinion work produce because documents generated in response to such a general investigation might not necessarily reveal a lawyer's focus. *Id.* at 253. And in *U.S. v. Deloitte LLP,* the D.C. Circuit remanded a discovery dispute to the district court to determine whether it could differentiate between (1) protected opinion work product concerning "thoughts and analyses by legal counsel" from (2) "other facts, other thoughts, other analyses by non-attorneys which may not be so intertwined with the legal analysis as to warrant protection under the work product doctrine." 610 F.3d 129, 139 (D.C.Cir. 2010),

■ Here, the disputed two bullet points are fact work product. They are short statements about the "result of a factual investigation." *In re Grand Jury Subpoena dated July 6, 2005,* 510 F.3d at 183.[4] While they set forth a factual determination by Ms. Zembower, they do not reveal a "critical mental impression" about an attorney's *evaluation* of the determination. *See In re Kellogg, Root, & Brown, Inc.,* 796 F.3d 137, 150 (D.C.Cir.2015) (critical mental impressions of attorney's lay agent protected); *see also Upjohn,* 449 U.S. at 399, 101 S.Ct. 677 (witness interview memoranda protected). The two bullet points do not suggest any evaluation about liability that might flow from the result of the factual determination contained within them, "reveal legal strategies" about the ongoing litigation, *In re Grand Jury Subpoena dated July 6, 2005,* 510 F.3d at 184, or show any "weeding out" of non-important facts by an attorney or party agent that would reveal Wells Fargo's theory of the case. *See Clemens,* 793 F.Supp.2d at 260.

However, Wells Fargo is still entitled to a protective order, because Relators have not yet met their heavy burden in showing substantial need and undue hardship.[5] At this stage, Relators are not prevented from obtaining discovery of the underlying facts at issue in the two bullet points. *See Upjohn,* 449 U.S. at 395–96, 101 S.Ct. 677 (attorney-client privilege only "protects disclosure of communications; it does not protect disclosure of the underlying facts," and so the "Government was free to question the employees who communicated

---

4. Relevant to the court's analysis is the fact that it appears a non-attorney prepared the bullet points at issue. *See U.S. ex rel. Landis v. Tailwind Sports Corp.,* 303 F.R.D. 429, 432 (D.D.C.2014) (memoranda or interview summaries prepared by non-attorneys were mixed fact and opinion work product; government was directed to redact portions of investigative memoranda like attorney notes or high-

lighting that revealed counsel's mental impressions).

5. In the event that Relators contend later that they can show substantial need and undue hardship after completing discovery, they may file an appropriate motion supported by evidence demonstrating that they meet this standard.

with [the investigator]" in order to help "secure the [factual underpinnings]" of an internal investigation.") The Court has already provided guidance to Relators on how they may proceed with their discovery efforts on this issue. (Order, Doc. 630.) Wells Fargo's Motion for Protective Order [Doc. 613] is therefore **GRANTED.**

## II. The Protected Status of Wells Fargo's Pre–Investigation E-mails.

Defendants also seek protection for two e-mails sent by non-attorney Wells Fargo employees to other, non-attorney employees on October 22, 2009, discussing the litigation that prompted the investigation. The first such e-mail, sent at 10:29 a.m., is from Cara Heiden, a Wells Fargo executive, to four non-attorneys: Mike Maher, Patrick Hellman, Susan Davis, and Kathleen Vaughan. The Court finds that the 10:29 a.m. e-mail is entirely business-oriented and is not protected by either attorney-client privilege or the work product doctrine. The Court, however, finds that the second e-mail, sent by Mr. Maher at 2:04 p.m., is protected by the work product doctrine.

### A. Attorney–Client Privilege for the 10:29 a.m. E-mail

Wells Fargo submitted a brief and *in camera* materials in support of its contention that the October 22, 2009 e-mails were both privileged and work product.

 The party invoking the attorney-client privilege bears the burden of proving that (1) an attorney-client relationship existed, (2) that a confidential communication was made to or from (3) an attorney who had been retained for the purpose of securing legal advice or assistance. *U.S. v. Schaltenbrand,* 930 F.2d 1554, 1562 (11th Cir.1991). "What is vital to the privilege is that the communication be made in

confidence for the purpose of obtaining legal advice from the lawyer." *U.S. v. Kovel,* 296 F.2d 918, 922 (2d Cir.1961) (Friendly, J.). This means that when a party seeks advice from a non-attorney, no privilege exists as to the communications with the non-attorney, even if he seeks advice on the same matter from an attorney later on. *Id.* As Judge Friendly recognized, "this draws what may seem to some a rather arbitrary line ... [b]ut that is the inevitable consequence of having to reconcile the absence of a privilege for [non-attorneys under most circumstances] and the effective operation of the privilege of client and lawyer under conditions where the lawyer needs outside help." *Id.*

 Wells Fargo cites *U.S. v. Davita* for the proposition that "[t]he lack of attorneys on either side of an otherwise confidential corporate communication is not fatal to a claim of privilege." *U.S. v. Davita,* 301 F.R.D. 676, 681–82 (N.D.Ga. 2014). Wells Fargo reads too much into *Davita's* language. Communications by non-attorneys are generally only protected by privilege if those non-attorneys are "employed to assist the lawyer in the rendition of professional legal services." *Loftin v. Bande,* 258 F.R.D. 31, 34 (D.D.C. 2009) (e-mail between non-attorneys with attorney copied was privileged, since one of the non-attorneys was employed by legal department and communication was made for purpose of obtaining legal advice); *see also Republic of Ecuador v. Hinchee,* 741 F.3d 1185, 1189 (11th Cir. 2013) (testifying expert's communications with non-attorneys were non-privileged; nor were testifying expert's notes subject to work product protection); *Gucci America, Inc. v. Guess?, Inc.,* 271 F.R.D. 58, 75– 76 (S.D.N.Y.2010) (communications between non-attorneys non-privileged "unless they make reference to confidential communications with counsel.")[6] More,

---

**6.** To the extent that Wells Fargo argues that

because the e-mail directs an employee to go

*Davita* notes that the "lack of any lawyer involvement in any particular communication [is] a factor tending to weigh against [a party] in showing the privileged nature of that communication." *Davita*, 301 F.R.D. at 681–82;

■■■■ Instead, the "ultimate touchstone for application of the privilege ... is whether the communication revealed advice from, or a request for advice made to, an attorney in some fashion." *Davita*, 301 F.R.D. at 682. This is generally phrased as the "primary purpose" test. *In re Vioxx*, 501 F.Supp.2d 789, 796–97 (E.D.La. 2007); *see also Neuder v. Battelle Pacific Northwest Nat. Laboratory*, 194 F.R.D. 289, 295 (D.D.C.2000) ("documents prepared by non-attorneys and addressed to non-attorneys with copies routed to counsel are generally not privileged since they are not communications made primarily for legal advice") (citations and quotations omitted). If one of the primary purposes of the communication is to seek legal advice, then the privilege attaches. *See Upjohn*, 449 U.S. at 394, 101 S.Ct. 677 ("The communications at issue were made by Upjohn employees to counsel for Upjohn acting as such, at the direction of corporate superiors in order to secure legal advice from counsel" and were thus privileged); *see also In re Kellogg, Brown, & Root, Inc.*, 756 F.3d 754, 760 (D.C.Cir. 2014). For investigations, communications, and the like that are "of a nature that the business would ordinarily have conducted in all events," the privilege does not attach. *U.S. v. ISS Marine Services*, 905 F.Supp.2d 121, 129–130 (D.D.C.2012)

(when party initially excluded counsel from investigation but then retained them later in a "watered-down" capacity, investigation was not privileged); *In re Vioxx*, 501 F.Supp.2d at 798–99 (a "lawyer's role as lawyer" in a communication must be primary for privilege to attach).

■■■ Given the above principles, it is plain that the 10:29 a.m. e-mail is not privileged. First, it was not made by, to, or at the direction of counsel. Instead, it was sent by a non-attorney, exclusively to other non-attorneys, with no evidence that an attorney requested that the communication be delivered. Thus, Wells Fargo has not shown that the e-mail was made to counsel or at the direction of counsel. *See Upjohn*, 449 U.S. at 394, 101 S.Ct. 677.

In addition, the e-mail's purpose is almost entirely business-oriented. The first three lines of the e-mail describe a routine business practice of maintaining a compliance program. The next three lines direct Mr. Maher—a non-attorney—to meet with counsel *alongside* "business to correct" the issue. The final two lines of the e-mail discuss, exclusively with non-attorneys, the possibility of an upcoming settlement of the lawsuit. This discussion appears to be wholly about the financial and business impacts of the lawsuit. In sum, the e-mail is sent by a non-attorney to other non-attorneys, and does not seek or disseminate legal advice. This is insufficient to warrant the application of the attorney-client privilege. *See In re Vioxx*, 501 F.Supp.2d at 796 (denying protection when communications do not reflect "information gathered by corporate employees for transmission to corporate counsel for the rendering of legal advice.").[7]

---

communicate with counsel, the e-mail "makes reference to confidential communications with counsel," that argument fails. First, it is a directive to *go* communicate, not an actual communication from or to counsel that contains legal advice. Second, at the time the e-mail was sent, it appears that Ms. Heiden's

primary concern was business-related, not legal.

7. *See also Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, No. 07–cv–1190, 2010 WL 5014483 at *3 (S.D.Oh. Dec. 3, 2010) (while extension of privilege to communications between non-attorneys is appropriate in some

## B. Work Product Protection for the 10:29 a.m. E-mail

The 10:29 a.m. e-mail is also not protected by the work product doctrine. "[M]aterials may be prepared before or when litigation is imminent or pending without necessarily having been ... prepared "in anticipation" of litigation from a motivational point of view." 2 EPSTEIN at 836. The purpose of the 10:29 a.m. email is, on its face, business oriented. It discusses a preventative business action, directs the recipient to meet with counsel *and* "business" to engage in corrective action, and discusses the possibility of a settlement with nothing but non-lawyers, indicating a focus on the business impact of such settlement.

■ Most importantly, it does not reveal the "legal theories" of critical mental impressions of an attorney or an attorney's agent—because an attorney has not actually been contacted yet. *See Deloitte LLP*, 610 F.3d at 139 (facts and analyses not "intertwined" with legal theories or impressions of counsel not always entitled to protection). While the e-mail satisfies the temporal component of the "in anticipation of litigation" requirement, it does not satisfy the motivational component. *Davis*, 636 F.2d at 1040 ("primary motivating purpose" behind document must be to aid in litigation). An initial communication involving no attorneys, seeking no specific legal advice, primarily concerning business purposes, and which discloses no theory of the case or other critical mental impressions of an attorney's agent is not protected by the work product doctrine.

circumstances, "it is appropriate to require substantial proof that the exception applies ... [because] to adopt any other construction of the evidence would be to enlarge the attorney-client privilege beyond its legitimate boundaries by concluding that any time there

## C. The 2:04 p.m. E-mail

■ With respect to the October 22, 2009 e-mail sent by Mike Maher at 2:04 p.m., the Court does not reach the issue of privilege, because that e-mail is protected by the work product doctrine. Wells Fargo's *in camera* submissions show that the e-mail was prepared at the direction of and in anticipation of a meeting with counsel about the investigation. The 2:04 p.m. e-mail is therefore protected by the work product doctrine.

## III. Conclusion

Wells Fargo's Motion for Protective Order [Doc. 613] is therefore **GRANTED**. Wells Fargo is further **DIRECTED** to produce to Relators the October 22, 2009 e-mail sent at 10:29 a.m.

**IT IS SO ORDERED** this 16th day of November, 2015.

is some temporal relationship between non-lawyer communications and a request for legal advice from an attorney concerning the same subject, the former must necessarily have been ... primarily intended to facilitate the latter.")